# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00390-CV

**Citizens Against Landfill Location; North Alamo Water Supply Corporation; Jimmie Steidinger; Engelman Irrigation District; and Donna Irrigation District, Hidalgo County No. 1, Appellants**

**v.**

**Texas Commission on Environmental Quality and BFI Waste Systems of North America, Inc., Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT NO. GN200320, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING

## O P I N I O N

Appellants, the Citizens Against Landfill Location, North Alamo Water Supply Corp., Jimmie Steidinger, Engelman Irrigation District, and Donna Irrigation District (collectively the Citizens), appeal from a district court judgment affirming a final order of the Texas Natural Resource Conservation Commission[1] granting BFI Waste Systems (BFI) a permit to vertically expand its municipal solid-waste landfill in Hidalgo county. In issues one, two, three and six, the Citizens

---

[1] By statute effective September 1, 2001, the legislature changed the name of the Texas Natural Resource Conservation Commission to the Texas Commission of Environmental Quality, to be effective January 1, 2004. The statute granted the agency authority to adopt a timetable for phasing in the change of the its name, so that until January 1, 2004, the agency was permitted to perform any act authorized by law under either title. *See* Act of April 20, 2001, 77th Leg., R.S., ch. 965, § 18.01, 2001 Tex. Gen. Laws 1985, 1985. On September 1, 2002, the agency began using its new name, while continuing to recognize the former. We will refer to the agency as the Commission.

assert that substantial evidence does not support the Commission's approval of the final-cover design, post-closure bond, and closure and post-closure cost estimates; approval of the drainage plan; modification of the application to require the installation of two additional monitoring wells; and findings and conclusions that BFI had met all legal requirements with respect to its application. In issues four and five, the Citizens argue that the Commission erred by refusing to enforce the higher standard set forth in BFI's drainage permit, which authorized it to discharge water into the Donna Irrigation District's system, and by concluding that BFI is authorized to capture and impound water for irrigation and dust suppression purposes. Because we hold that the record contains substantial evidence supporting the Commission's order and that the Commission's actions were not in error, we affirm the district court's judgment affirming the order.

**BACKGROUND**

In 1988, the Commission issued a permit that allowed BFI to construct and operate a municipal solid-waste landfill in Hidalgo County. The landfill was to be built directly adjacent to the local water-treatment plant. The issuance of the permit was hotly contested, and after several years of litigation, this Court affirmed the Commission's order approving the permit. *See North Alamo Water Supply Corp. v. Texas Dep't of Health*, 839 S.W.2d 448 (Tex. App.—Austin 1992, writ denied).

In July 1997, BFI filed an application with the Commission requesting an amendment to its permit to allow it to vertically expand the landfill and begin accepting Class I industrial waste. It would also extend the remaining life of the landfill from nine years to approximately twenty years.

2

The Commission declared the permit expansion application administratively complete in August 1997 and technically complete in October 1998.[2]

Several local communities, businesses, and residents expressed opinions both for and against the proposed expansion.[3] In response to numerous requests for a public hearing on the matter, the Commission referred the issue to the State Office of Administrative Hearings, and a contested-case hearing was held in April and May of 2001. After hearing testimony and reviewing the record, the two presiding administrative law judges (ALJs) issued a proposal for decision in favor of granting the permit to expand. After reviewing the application, the proposal for decision, and arguments from both sides, the Commission determined that BFI's application sufficiently met all legal requirements for the issuance of the amended permit. The Commission ordered that BFI's application be approved with certain modifications. The only modifications applicable to this appeal are that the final cover will include a soil erosion layer at least twelve inches deep that is capable of sustaining native plant growth and that, within ninety days of the issuance of the permit, BFI shall install two additional monitoring wells along the southern perimeter of the facility as specified in the order.[4] The Citizens filed a suit for judicial review in Travis County district court. *See* Tex. Gov't

---

[2] We discuss the significance of the Commission's determinations that BFI's application was administratively and technically complete in our analysis of the Citizens' complaints regarding the adequacy of the evidence presented at the administrative hearing.

[3] The Mayors of the cities of Edcouch, Elsa, La Feria, Los Fresnos, Mercedes, Alamo, Rio Hondo, San Juan, South Padre Island, and Weslaco; the Cameron County Commissioner; the Donna City Manager; a County Commissioner from Hidalgo County; the President of the Rio Grande Valley Partnership/Rio Grande Valley Chamber of Commerce; and the Executive Director of the Weslaco Development Committee each wrote letters to the Commission expressing their support of BFI's proposed expansion.

[4] Originally, BFI's application had provided that there would be a six inch erosion layer and that the previously approved monitoring system would be unchanged.

Code Ann. § 2001.171 (West 2000). The district court affirmed the Commission's order, and this appeal followed.

## DISCUSSION

Judicial review of an administrative order following a contested-case proceeding is governed by the substantial evidence rule, which provides as follows:

> If the law authorizes review of a decision in a contested case under the substantial evidence rule or if the law does not define the scope of judicial review, a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but:
>
> (1) may affirm the agency decision in whole or in part; and
>
> (2) shall reverse or remand the case for further proceedings if the substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
>
>   (A) in violation of a constitutional or statutory provision;
>
>   (B) in excess of the agency's statutory authority;
>
>   (C) made through unlawful procedure;
>
>   (D) affected by other error of law;
>
>   (E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or
>
>   (F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

*See id*. § 2001.174 (West 2000). The Citizens aver that the Commission's decision to issue BFI the amended permit is either not supported by substantial evidence in the record, is arbitrary and

4

capricious, is affected by other error of law, or is in violation of a statutory provision. *See id*. § 2001.174(2)(A), (D)-(F).

Under the substantial evidence rule we review the evidence as a whole to determine if it is such that reasonable minds could have reached the same conclusion as the agency in the disputed action. *See H.G. Sledge, Inc. v. Prospective Inv. & Trading Co.*, 36 S.W.3d 597, 602 (Tex. App.—Austin 2000, pet. denied) (citing *Texas State Bd. of Dental Exam'rs v. Sizemore*, 759 S.W.2d 114, 116 (Tex. 1988)); *see also Stratton v. Austin Indep. Sch. Dist.*, 8 S.W.3d 26, 30 (Tex. App.—Austin 1999, no pet.). We may not substitute our judgment for that of the agency and may only consider the record on which the agency based its decision. Tex. Gov't Code Ann. § 2001.174; *Stratton*, 8 S.W.3d at 30. The issue before us is not whether the agency reached the correct conclusion but whether there is some basis in the record for its action. *See City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 185 (Tex. 1994); *see also Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 452 (Tex. 1984). Although substantial evidence is more than a mere scintilla, the evidence in the record may actually preponderate against the agency's decision and nonetheless amount to substantial evidence. *See State v. Public Util. Comm'n*, 883 S.W.2d 190, 204 (Tex. 1994). We presume that the agency's findings, inferences, conclusions, and decisions are supported by substantial evidence, and the burden to prove otherwise is on the appellant. *Charter Med.*, 665 S.W.2d at 453; *Stratton*, 8 S.W.3d at 30. Finally, the agency's decision should be reversed only if the party challenging the decision demonstrates that the absence of substantial evidence has prejudiced the party's substantial rights. *See Locklear v. Texas Dep't of Ins.*, 30 S.W.3d 595, 597 (Tex. App.—Austin 2000, no pet.).

5

**Establishment and Maintenance of Final Cover**

The Commission's rules require that the owner or operator of a municipal solid-waste landfill complete installation of a final-cover system to minimize infiltration and erosion within 180 days of the last receipt of wastes. 30 Tex. Admin. Code § 330.253(b) (West 2005). The infiltration layer must consist of a minimum of eighteen inches of earthen material overlain by a synthetic membrane that has a permeability less than or equal to the permeability of any bottom-liner system. *Id*. The erosion layer must consist of a minimum of six inches of earthen material that is capable of sustaining native plant growth and will be seeded or sodded immediately following the application of the final cover in order to minimize erosion. *Id*. § 330.253(b)(3). The specifications for the final cover design included in BFI's application essentially trace the requirements set forth in the Commission's rules.

The Citizens argue that portions of the Commission's order approving (1) the final-cover design and mandating the use of an erosion layer of "at least twelve inches" and, (2) the financial assurance bond, closure-cost estimates, and post-closure cost estimates, are not supported by substantial evidence. The Citizens also contend that BFI's final-cover plan lacks sufficient detail to demonstrate that BFI will successfully establish vegetation on the erosion layer because its contents merely recite statutory performance standards.

*Erosion Layer*

The Citizens contend that both the ALJs and the Commission concluded that BFI's plan to use six inches of topsoil as the erosion layer was deficient because they both recommended that BFI be required instead to install at least twelve inches of topsoil in order to obtain the permit.

6

The Citizens claim that the record does not contain evidence supporting the conclusion that twelve inches of topsoil is sufficient to establish and maintain the required vegetative cover. We disagree.

At the application hearing, the Citizens called a series of witnesses to testify in support of their contention that six inches of soil, as called for in BFI's application, is inadequate to establish vegetative cover at the landfill. Dr. James Smart, a research agronomist who lives in the Rio Grande Valley, testified that a combination of forty to fifty inches of top soil, a supplemental irrigation system, a greater seeding rate than that provided for in the application, and a plan for removing salt from the soil would be necessary to successfully establish and sustain vegetative cover at the landfill. Chester Drash, a professional engineer, and Boyd Davis, a local resident who works in the drainage and irrigation business, similarly testified that between thirty and thirty-six inches of top soil would be necessary to establish and sustain vegetation at the site. Dr. Richard Hoverson, a forage consultant, Esper Chandler, an agricultural consultant in the Rio Grande Valley, and Robert Rektorik, a retired Department of Agriculture scientist, each testified that supplemental irrigation and a drainage plan to combat salt build up would be necessary. Essentially, the Citizens argued that the plan presented in the application was deficient because it did not provide specific details regarding how BFI would fulfill its statutory duty of growing grass at the site.

BFI responded by asserting that the Commission's rule sets forth a performance standard in which the minimum requirement is stated, but ultimately if this proves insufficient to achieve the goal of minimizing erosion by use of native plant growth, then whatever steps are necessary to meet that goal must be followed. *See id.* Consequently, BFI contended that if the specifications set forth in its application proved to be insufficient, it would still have a legal duty to

7

establish and sustain vegetation on the erosion layer. BFI then noted that both the application and the site-operating plan contain several provisions that outline the commitments it has made to ensure that the proposed erosion layer is successful. Specifically, the final-closure plan provides that the erosion layer will consist of soil suitable for plant growth, which will be seeded and mulched as necessary to establish vegetative cover. Additionally, the site-operating plan states that the vegetative cover will be watered and fertilized as needed to protect the integrity of the cover, that soil tests will be conducted to determine the exact nutrients necessary to ensure vegetative growth, and that BFI will consult with the Hidalgo County Extension Office regarding proper fertilizer and seed mixtures.

BFI also provided rebuttal testimony to combat the claims of Citizens' witnesses pertaining to the depth of soil necessary to establish vegetative cover on the erosion layer. BFI first called Dr. Craig Benson, a professor of geological engineering at the University of Wisconsin. Dr. Benson testified that he visited the site and observed the northern slope of the landfill that had received intermediate cover within the last "year or so."[5] He stated that it was his understanding that this area "was seeded, watered apparently once to get the grass growing and henceforth left to grow on its own." He further stated that the soil depth of this area was approximately twelve to eighteen inches. Benson collected two soil samples that he analyzed to determine the root density of the grass at two-inch intervals throughout the sample. He testified that he found that approximately eighty percent of the root mass was located in the upper six inches of the sample and that approximately

_____

[5] Intermediate cover is achieved by placing top soil directly on top of the waste mass. This is done when a particular area of the landfill is not active. Additionally, Bermuda, the type of grass that was used for intermediate cover, is the same type that BFI plans to use on the final cover.

ninety-five percent of the root mass was located in the upper twelve inches of the sample. Based on these findings, he concluded that the water used by the grass was practically limited to the upper twelve inches of soil.

Dr. Benson also testified that it was unlikely that supplemental irrigation would be necessary. He explained this by distinguishing between growing grass as a crop and growing grass as a tool to minimize erosion. He testified that in agricultural production the objective is to ensure that the water content of the soil remains at a sufficiently high level so that the plant does not suffer water stress in order to optimize yields. However, when the goal is erosion control, Dr. Benson stated that water is only necessary to sustain vegetative life so that the plant remains in place. He further asserted that, because the vegetation would need less irrigation, it is unlikely that excess salts would accumulate in the soil. In addition, Dr. Benson claimed that if irrigation becomes necessary, the rainfall that is collected and impounded in the detention channel would be adequate for the task.

The ALJs found that the Citizens' witnesses overestimated the depth of soil that would be required to provide cover, especially in light of Dr. Benson's analysis demonstrating that only water in the top foot of topsoil would generally be available to the type of grass that will be grown at the site. They observed that part of the rationale underlying the recommendations of the Citizens' witnesses for increased topsoil was their belief that salt in irrigation water would accumulate and need to be drained. However, the ALJs noted that the witnesses' concern was based on the incorrect belief that BFI has no right to irrigate with the rainwater it collects in the detention

9

channel, which has a low salt concentration.[6]  Accordingly, the ALJs accepted Dr. Benson's assessment that the threat of salt accumulation was insignificant.  The ALJs concluded that it was conceivable that six inches of topsoil would be sufficient to comply with the Commission's rules, but felt that there was no reason to risk the possibility that it would be inadequate.  Therefore, they proposed that BFI's application be amended to require BFI to install a soil-erosion layer at least twelve inches deep and capable of sustaining native plant growth.  The Commission adopted this recommendation.

Although the record contains evidence suggesting that more than twelve inches of soil may be necessary to successfully establish and maintain vegetative growth on the final cover, the Commission's conclusion is supported by substantial evidence.  Both the ALJs and the Commission cited Dr. Benson's root mass analysis indicating that only water located in the uppermost twelve inches of soil would be available to the grass grown at the site in support of their conclusion that twelve inches of topsoil is an adequate erosion layer.  Furthermore, the ALJs were not persuaded by the claims of the Citizens' witnesses that at least three feet of topsoil would be necessary to establish and sustain vegetative cover at the site.  The ALJs and the Commission were free to weigh the conflicting evidence as they deemed appropriate, and the Commission, as the final judge of the validity and credibility of expert testimony, may accept or reject part or all of a witness's conclusions.  *See Coalition for Long Point Pres. v. Texas Comm'n on Envtl. Quality*, 106 S.W.3d 363, 368 (Tex. App.—Austin 2003, pet. denied); *see also Texas Water Comm'n v. Boyt Realty Co.*,

---

[6]  Below, we discuss BFI's right to capture and use storm water run-off impounded in its detention channel.

10 S.W.3d 334, 343 (Tex. App.—Austin 2000, no pet.). The Commission's final order also notes that BFI is required to "conduct any maintenance or remediation activities necessary to maintain the integrity and effectiveness of all final cover [and] site vegetation." The order further notes that BFI's site-operating plan sets forth specific procedures for establishing and maintaining vegetative cover. Even if the Citizens established that the evidence in the record preponderates against the Commission's finding that twelve inches of topsoil constitutes an adequate erosion layer, we hold that the record contains more than a scintilla of evidence supporting the Commission's findings and conclusions regarding the depth of the required erosion layer. *See Public Util. Comm'n*, 883 S.W.2d at 204.

*Cost Estimates*

Owners and operators of municipal solid-waste landfills are required to provide detailed written estimates showing both the cost of hiring a third party to close the largest area of the landfill ever requiring final closure and the cost of hiring a third party to conduct post-closure care activities at the landfill. *See* 30 Tex. Admin. Code §§ 330.281, .283 (West 2005). The Citizens claim that there is no evidence in the record supporting the approval of the closure and post-closure cost estimates provided in BFI's application since the plans for the erosion layer do not account for the possibility that BFI may be unable to establish vegetative cover on top of the originally proposed six-inch erosion layer.

BFI argues that its estimates were conservative in that they included a twenty-percent contingency for possible cost increases. BFI also noted that the Commission's rules require that cost

11

estimates and the corresponding financial-assurance bonds be increased if changes in either the closure or post-closure plan increase the costs of closing the landfill or post-closure maintenance. *See id*. §§ 330.281(a)(2), .283(a)(2).

The ALJs found that much of the Citizens' concern regarding BFI's cost estimates was based on their contentions that the proposed erosion layer would have to be increased from six inches to at least three feet and that a supplemental irrigation and drainage system would be required. As discussed above, the ALJs disagreed that these steps would be necessary to establish and maintain vegetation on the final cover. However, because the ALJs concluded that the thickness of the erosion layer should be doubled from six inches to twelve inches, they recommended that the portion of the final cover cost estimate pertaining to installation of the erosion layer be doubled. Furthermore, the ALJs stated that they believed their approach was supported by the record "because the projected cost is only an estimate subject to future correction, and because it likely overstates the cost in that it accounts for no economies of scale."

Essentially, the Citizens contend that because BFI's final-cover design is flawed, the cost estimates based on that design are also flawed. However, the Citizens do not point to any specific evidence establishing that the closure and post-closure cost estimates were either miscalculated or based on inappropriate data. Therefore, we hold that the record contains more than a scintilla of evidence supporting the Commission's findings and conclusions regarding the closure and post-closure cost estimates and the corresponding financial-assurance bond. *See Public Util. Comm'n*, 883 S.W.2d at 204.

*Sufficiency of BFI's Permit Application*

The Citizens contend that, because BFI's application merely recites the specific language of the Commission's rules pertaining to the effectiveness of the erosion layer, the Commission erroneously approved the application. BFI must include in the site-development-plan component of the application sufficient information to document that its final-cover design will provide effective long-term erosional stability. 30 Tex. Admin. Code § 330.55(b)(8) (West 2005). Additionally, BFI's application must also include the minimum information required by the Commission regarding the final-cover plan. *See id.* § 330.253(d)(1)-(6). The Citizens point to *BFI Waste Systems of North America v. Martinez Environmental Group*, 93 S.W.3d 570 (Tex. App.—Austin 2002, pet. denied), in which we held an applicant's mere recitation of statutory requirements insufficient to satisfy the applicant's burden of proving by a preponderance of the evidence that it met each regulatory requirement. Thus, the Citizens contend that if BFI merely tracked the Commission's regulatory requirements in its application, *Martinez* requires us to reverse. We disagree.

The portions of the application at issue in this case are readily distinguishable from those addressed in *Martinez*. In *Martinez*, we held that the Commission's rule governing site-operating plans required an applicant to set forth specific, enforceable procedures governing the daily operation of a specific landfill.[7] *Martinez*, 93 S.W.3d at 580. Our holding in *Martinez* was premised

---

[7] The Commission's rule governing site operating plans is found at 30 Tex. Admin. Code § 330.114 (West 2005). Section 330.114 states that, "The site operating plan (SOP) shall provide operating procedures for the site management and the site operating personnel in sufficient detail to enable them to conduct the day-to-day operations of the facility." *Id.*

on the fact that the Commission's rules pertaining to site operating plans consist of general requirements that allow landfill operators to develop specific operating procedures tailored to their individual sites. *Id.* Because there are no detailed rules to guide the daily operation of a landfill, we held that requiring an applicant to provide specific, enforceable procedures was necessary to ensure that an applicant complies with all applicable regulations and operates the site in a manner that does not compromise health and safety. *See id.*

Here, the Citizens' complaints focus on the site-development plan, specifically the final-cover design. While there are no detailed rules governing the daily operations of a landfill, there are specific performance standards that apply to the installation, maintenance, and overall effectiveness of final cover. For example, a final-cover design should contain sufficient information to demonstrate that (1) estimated peak velocities for top surfaces and embankment slopes are less than the permissible non-erodible velocities under similar conditions; and (2) top surfaces and embankment slopes are designed to minimize erosion and soil loss through the use of appropriate side slopes, vegetation, and other structural and non-structural controls. 30 Tex. Admin. Code § 330.55(b)(8)(A)-(B). Furthermore, the Commission's final-cover rules provide performance standards that an applicant must meet regardless of whether the application contains sufficient detail to establish that its plan will be successful. Thus, our holding in *Martinez* is inapplicable to this case.

Moreover, the record contains substantial evidence supporting the Commission's finding that BFI's application contained sufficient information addressing both how it would ensure erosional stability during the life of the landfill and its procedures pertaining to the installation,

14

establishment, and maintenance of the erosion layer of the final-cover system. In Attachment 6 to the site-development plan, BFI specifically provided several structural and non-structural methods of controlling erosion—such as temporary vegetation, compacted soil stockpiles, temporary ditches, filter fences, and gravel berms that would be employed at the site. BFI also provided information as to how these structures should be installed and maintained. As we discussed previously, BFI's site-operating plan contained specific details and procedures dealing with how the erosion layer would be installed, established, and maintained.

We hold that the record contains substantial evidence supporting the Commission's findings and conclusions with respect to its approval of the modified-final-cover design mandating the use of an erosion layer of "at least twelve inches," and the financial-assurance bond, closure-cost estimates, and post-closure cost estimates. We also hold that the Commission committed no legal error by failing to apply *Martinez* to this case. We overrule the Citizens' first issue.

**Surface Water Drainage**

In order to obtain the expansion permit, BFI must demonstrate in its application that it can design, construct, and maintain a run-off management system that can collect and control at least the water volume resulting from a 24-hour, 25-year storm. *See* 30 Tex. Admin. Code § 330.55(b)(3). The Citizens claim that under real world conditions BFI's drainage plan cannot actually comply with this regulation. The Citizens therefore insist that the Commission's order finding that BFI's application meets this regulatory requirement is not supported by substantial evidence.

15

At the administrative hearing, Paul Hartnett, a professional engineer and the landfill's designer, testified that the total volume of the detention channel surrounding the landfill is 96.7 acre-feet. He testified further that the volume of run-off associated with a 24-hour, 25-year storm is 64.2 acre-feet. Thus, the detention channel has sufficient capacity to collect and control the run-off associated with a 24-hour, 25-year storm. The Citizens were concerned that if BFI fails to establish vegetation on the final cover, then there would be substantial erosion that would cause a build up of sediment in the detention channel, thereby reducing its capacity. Hartnett countered this argument by outlining the permanent and temporary controls that would be used to prevent erosion and the build up of sediment in the channel. He stated that diversion structures, terraces, rip-rap, temporary and permanent vegetation, silt fences, gravel berms, erosion mats, diversion ditches and other features were incorporated into the landfill's design to prevent sediments from entering the channel. He further noted that BFI is required to maintain the channel, which includes removing any sediment.

The Citizens further contend that BFI's practice of impounding water in the detention channel impairs its ability to handle the required run-off. However, BFI argues that this concern is misplaced because evidence in the record indicates that the volume of water kept in the channel will be monitored to ensure that there is adequate remaining capacity to collect and control the run-off from a 24-hour, 25-year storm. Both the ALJs and the Commission found that the required capacity of the perimeter detention channel is not affected by the proposed expansion because the volume of run-off will not materially change as a result of the proposed height increase. This finding was

confirmed by the Citizens' drainage expert, Larry Smith, who testified that the proposed vertical expansion would not materially affect run-off volume.

The Citizens also question BFI's ability to quickly discharge run-off collected after a 24-hour, 25-year storm. BFI is permitted to discharge run-off into drainage ditches run by the Donna Irrigation District. Larry Smith testified that the Donna Irrigation District's drainage ditches are at maximum capacity after a 9.5-year storm. Smith stated that based on his calculations it would take approximately fifteen days for the Donna ditch system to drain after a 25-year storm. Under these conditions BFI would not be able to discharge any of the collected run-off until the ditches completely drained or flooding would occur. Smith thus concluded that if another storm "of almost any intensity" occurred during this time, the detention channel would overflow.

However, the Commission's rules do not require that BFI demonstrate that its detention channel has the capability to collect and control the run-off associated with a 24-hour, 25-year storm *and* the run-off from another storm occurring shortly thereafter. The Citizens' fear that the detention channel will overflow if a 24-hour, 25-year storm is quickly followed by another storm is based on the limitations of the Donna Irrigation District's drainage system, not BFI's detention channel. Therefore, the fact that the detention channel may overflow under the scenario posited by the Citizens is not evidence that BFI failed to comply with the Commission's rules. Furthermore, the ALJs found that there was no basis to deny BFI's amended permit application based on the limitations of the Donna Irrigation District's drainage ditches. To support this finding, the ALJs relied on BFI's evidence indicating that (1) the vertical expansion would not generate additional run-off, (2) the current drainage system reduces run-off into the ditches to levels lower than pre-

17

development conditions, and (3) there has been only one discharge into the drainage ditches during the entire history of the landfill.

We hold that the record contains substantial evidence supporting the finding that BFI's run-off management system complies with the Commission's rules. We overrule the Citizens' second issue.

**Groundwater Monitoring**

BFI is required to describe in its application a groundwater monitoring plan that "consists of a sufficient number of monitoring wells, installed at appropriate locations and depths, to yield representative groundwater samples from the uppermost aquifer" that when installed will "ensure the detection of groundwater contamination in the uppermost aquifer." 30 Tex. Admin. Code §§ 330.56(d)(6), .231(a), .231(a)(2) (West 2005). The design of the system shall be based on "site-specific technical information that must include a thorough characterization of aquifer thickness; ground-water flow rate; groundwater flow direction including seasonal and temporal fluctuations in flow; [and] the effect of site conditions and operations on groundwater flow directions and rates. . . ." *Id.* § 330.231(e)(1). The Citizens aver that because BFI's groundwater characterization report is insufficient, the Commission's approval of the ALJ's proposed modification, which adds two additional monitoring wells along the southern perimeter of the site, is not supported by substantial evidence.

At the administrative hearing, Paul Hartnett, Grant Jackson, and hydrogeologist Michael Snyder testified that the groundwater flow in the pertinent strata is predominantly to the north. The Citizens presented conflicting evidence that the groundwater beneath the landfill flows

18

south, in the direction of North Alamo's water treatment plant. The Citizens noted further that the application concedes that flow of groundwater in the area is influenced by a variety of factors that include the landfill itself and BFI's practice of impounding run-off in the detention channel surrounding the site.

The ALJs concluded that, while the predominant flow of groundwater is to the north, the monitoring system should be capable of detecting a groundwater contamination in all directions. The ALJs found that this conclusion was consistent with BFI's "prudent" approach of identifying the entire perimeter of the landfill site as the point of regulatory compliance. Even though the ALJs found that BFI's current plan meets all regulatory requirements, they recommended including two additional monitoring wells along the southern perimeter of the site so that the landfill's northern and southern boundaries each have a total of five wells.

We note that BFI is seeking a permit that would allow it to vertically expand the landfill. The proposed expansion does not involve any land outside that currently being monitored by a Commission-approved groundwater-monitoring system. The ALJs and the Commission found that the current monitoring system meets all regulatory requirements. However, the Commission and the ALJs concluded that the installation of two additional monitoring wells is an appropriate response to the Citizens' concerns regarding the variance in groundwater flow at the site. Furthermore, the placement of the additional wells equidistant from the existing wells along the southern perimeter is consistent with the current monitoring system's designation of the point of compliance as the entire perimeter of the site.

We hold that the record contains substantial evidence supporting the Commission's conclusion that the modified groundwater monitoring system is sufficient. We overrule the Citizens' third issue.

**Evidentiary Issues**

Throughout the contested case hearing, the Citizens objected to the admission of several of BFI's exhibits. In response, the ALJs denied the admission of one document. Many of the other exhibits were admitted only for the limited purpose of showing the basis of a witness's opinion but not for the truth of the matters contained in the exhibits. The Citizens aver that the limitations on these exhibits rendered BFI's application incomplete. Therefore, they claim the Commission erroneously approved BFI's application. We disagree.

An application is deemed administratively complete when submitted to the Commission with any required reports and fees, at which point the application becomes ready for technical review "in accordance with the rules of the Commission." Tex. Health & Safety Code Ann. § 361.068(a)(1)-(2) (West 2001). The Commission's rules set forth the technical requirements for each part of the application. *See* 30 Tex. Admin. Code §§ 330.51-.58 (West 2005). Although there is no statute or rule defining when an application is "technically complete," we conclude that construing the phrase to mean that an application will be considered technically complete if it includes information pertaining to all applicable technical requirements is consistent with the legislature's use of the phrase in health and safety code section 361.068. *See Texas Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002) (primary objective of statutory construction is to determine and give effect to legislature's intent). If the Commission has determined that an

application is administratively and technically complete and the application then becomes the subject of a contested case, the Commission may not subsequently revoke the determination. *See* Tex. Health & Safety Code Ann. § 361.068(b)(1). Thus, the purpose of a contested-case hearing is not to verify whether the application is administratively and technically complete, but rather to determine whether the substance of the information provided in the application can fulfill the statutory purpose of safeguarding the health, welfare, and physical property of the people and protecting the environment. *See id*. § 361.002(a) (West 2001).

In this case, BFI's application was determined to be administratively and technically complete prior to the contested case hearing. Therefore, BFI was not required to establish at the contested-case hearing that its application complied with each administrative and technical requirement because it had already done so prior to the hearing.

Even if BFI was required to submit evidence at the contested-case hearing demonstrating that its application met all of the Commission's regulatory requirements, the record contains substantial evidence supporting the Commission's finding that the application was complete. In fact, BFI's entire application was admitted for the specific purpose of establishing what the application contained.

The ALJs concluded that BFI had included all necessary information in the application. The ALJs asserted that, while some witnesses could not independently verify particular documents or exhibits, there was nothing in the record that cast doubt upon the information. Similarly, the Citizens did not introduce any contrary exhibits to demonstrate that the limited evidence was altered or falsified. Finally, the ALJs noted that the Commission had reviewed every

21

part of the application and determined that it was administratively and technically complete. Thus, the ALJs concluded that the application complied with appropriate statutes and rules.

We hold that substantial evidence in the record supports the Commission's finding that BFI's application was administratively and technically complete. We overrule the Citizens' sixth issue.

**Discharge into the Donna Irrigation District's Ditches**

As discussed previously, BFI is required to demonstrate that its run-off management system is capable of collecting and controlling the water volume resulting from a 24-hour, 25-year storm. In order for BFI's proposed run-off management system to function as designed, BFI must have permission to discharge excess run-off collected in its detention channel into the Donna Irrigation District's drainage ditches. The permit BFI submitted with its expansion application was issued as a result of the settlement agreement that terminated the litigation surrounding the Commission's approval of the initial permit to construct and operate the landfill at issue in this case. As part of the settlement, BFI agreed, among other things, to design and construct its detention channel so that it would be capable of collecting and controlling the run-off from a 100-year storm.

After BFI submitted its expansion application to the Commission, two of the appellants, North Alamo Water Supply and Jimmie Steidinger, filed suit in a Hidalgo County district court seeking a declaratory judgment and injunctive relief. North Alamo and Steidinger claimed that BFI had breached the settlement agreement, that the proposed expansion would breach the

agreement, and that BFI had fraudulently induced them and others to enter into the agreement.[8] They petitioned the court to declare that BFI is prohibited from operating the landfill except as allowed in the agreement, to mandate specific performance of the agreement, and to order BFI to withdraw its pending expansion application. They also requested injunctive relief barring BFI from participating in further administrative proceedings regarding its proposed expansion. The district court granted their request for injunctive relief. BFI appealed, and the injunction was dissolved. *See BFI Waste Sys. of N. Am. v. North Alamo Water Supply Corp.*, No. 13-99-469-CV, 2000 Tex. App. LEXIS 1282 (Tex. App.—Corpus Christi 2000, pet. dism'd w.o.j.).[9]

In this case, the ALJs found that, while BFI's calculations demonstrate that the detention channel has the capacity to contain the run-off, BFI's practice of impounding water in the channel effectively eliminates the ability to handle a 24-hour, 100-year storm. The Citizens claim that since it is clear that BFI has not met the condition upon which its discharge permit was issued it cannot establish that it has the authority to discharge run-off into the Donna Irrigation District's ditches. Therefore, the Citizens argue that because the ability to discharge into these drainage ditches is essential to BFI's run-off management system, the Commission had a duty to guarantee that BFI had authority to do so in order to find that the system complied with its rules. They insist that the Commission's failure to enforce the higher standard set forth in BFI's drainage permit was error.

---

[8] North Alamo and Steidinger claimed, among other things, that BFI breached the settlement agreement by failing to construct its detention channel so that it could collect and control the run-off resulting from a 100-year storm.

[9] There is no information in the record pertaining to the current status of North Alamo's and Steidinger's declaratory suit.

23

It is undisputed that the standard set forth in BFI's discharge permit exceeds the regulatory requirement set forth by the Commission. However, the question for us is whether the Commission possesses the authority or the duty to enforce the higher standard of the settlement agreement. The ALJs concluded that BFI was not required to demonstrate in its application that it could collect and control the run-off resulting from a 100-year storm. The ALJs asserted that the Commission is obliged to follow its own rules and the standard set by the Commission for landfill permitting is the only one that could be applied at the permit proceeding. The ALJs went on to say that, "[e]nforcement of the settlement agreement is more appropriately left to the civil court system that generated it." We agree with the ALJs and conclude that the Commission's authority is limited by the scope of its own duly promulgated rules. Furthermore, the Citizens have not pointed to any evidence in the record indicating that BFI's current discharge permit has been declared invalid. Therefore, we conclude that the Commission did not err by failing to enforce the higher standard and that substantial evidence in the record supports its conclusion that BFI's run-off management system complies with its rules. We overrule the Citizens' fourth issue.

**Authority to Capture and Detain Water**

The Citizens aver that the Commission ignored BFI's failure to provide evidence of a right to impound water in its detention channel for the purposes of dust suppression and irrigation. Texas Water Code section 11.021(a) provides:

> The water of the ordinary flow, underflow, and tides of every flowing river, natural stream, and lake, and of every bay or arm of the Gulf of Mexico, and the storm water, floodwater, and rainwater of every river, natural stream, canyon, ravine, depression, and watershed in the state is the property of the state.

24

Tex. Water Code Ann. § 11.021(a) (West 2000). The Citizens claim that BFI's practice of impounding water in its detention channel constitutes a wrongful diversion of state water if done without a permit. Thus, the Citizens posit that the Commission was required to ascertain whether BFI possessed such a permit in order to approve the application and that its failure to do so constituted error as a matter of law. We disagree.

Texas law categorizes surface water into one of two general types: diffuse surface water and water in a water course. *See City of San Marcos v. Texas Comm'n on Envtl. Quality*, 128 S.W.3d 264, 271-72 (Tex. App.—Austin 2004, pet. denied); *see also Domel v. City of Georgetown*, 6 S.W.3d 349, 353 (Tex. App.—Austin 1999, pet. denied). Diffuse surface water belongs to the owner of the land on which it gathers, so long as it remains on that land prior to its passage into a natural watercourse. *City of San Marcos*, 128 S.W.3d at 272 (citing *Turner v. Big Lake Oil Co.*, 96 S.W.2d 221, 228 (Tex. 1936)). Water in a watercourse is the property of the State. *See* Tex. Water Code Ann. § 11.021(a). A watercourse has (1) a defined bank and beds, (2) a current of water, and (3) a permanent source of supply. *See Hoefs v. Short*, 273 S.W. 785, 787 (Tex. 1925). The right to use State water may be acquired by obtaining a permit from the Commission to make an appropriation. *See* Tex. Water Code Ann. §§ 11.022, .121 (West 2000).

The record contains evidence that the detention channel is completely manmade and is designed to capture only the surface water that originates onsite; that there is no water flow from outside the site into the detention channel. If necessary, the detention channel is designed to be able to discharge excess water *into* public drainage ditches, but we have found no evidence that BFI diverts any water *from* the public drainage ditches or nearby irrigation canals. Finally, there is

testimony that the only purpose of the detention channel is to collect rainwater and not to divert the ordinary flow from any adjacent river, stream, or water course. Thus, we find that, while it could be argued that the detention channel has defined banks and beds, the evidence in the record is clear that the water in the channel has no defined current and that there is no permanent supply of water feeding the channel. Therefore, we hold that the detention channel is not a watercourse. Consequently, BFI may impound diffuse surface water originating at the landfill without a permit.

We hold that the Commission did not err as a matter of law by determining that BFI was not required to demonstrate that it possessed a permit to collect diffuse surface water in its detention channel to be used later for dust suppression and irrigation. We overrule the Citizens' fifth issue.

## CONCLUSION

The Commission's order approving BFI's expansion permit was supported by substantial evidence and not in error. We affirm the district court's judgment affirming the Commission's order.

_____

Bea Ann Smith, Justice

Before Justices B. A. Smith, Puryear and Pemberton

Affirmed

Filed: May 12, 2005