

## NUMBER 13-13-00189-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

RICK WOOD,                                                                          Appellant,

 v.

TEXAS COMMISSION
ENVIRONMENTAL QUALITY,                                                  Appellee.

### On appeal from the 261st District Court
### of Travis County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Benavides**
**Memorandum Opinion by Justice Benavides**

We issued an opinion in this case on December 30, 2014, affirming the trial

court's judgment.  Appellant, Rick Wood, subsequently filed a motion for

rehearing.  Without changing our previous disposition, we deny the motion for rehearing,

withdraw our earlier opinion and associated judgment, and issue this substitute opinion and judgment in their stead.

This is an appeal from a Travis County District Court decision on an administrative agency act. Wood, a landowner, filed a protest with the State Office of the Administrative Hearings (SOAH) challenging the application of Lerin Hills Municipal Utility District (Lerin Hills) for a proposed water treatment center to be built near his property. Initially, an Administrative Law Judge (ALJ) issued a proposal for decision denying Lerin Hills's application on one issue: whether the application met the Texas Commission on Environmental Quality's (the Commission's) antidegradation rule. Upon review, the Commission overruled the ALJ, approved the project, and issued a revised order explaining its decision. Wood then appealed the Commission's final order to a state district court, which upheld the Commission's approval and granted the Commission's no-evidence motion for summary judgment on Wood's Texas Open Meetings Act claim.

By seven issues, which we re-number and re-organize as four, Wood contends that: (1) the decision not to refer a regionalization, or need, issue to the SOAH was erroneous; (2) the Commission erred when it held that Lerin Hills met the Commission's Tier 2 antidegradation standard; (3) the Commission erred when it revised the ALJ's proposed order to approve the project; and (4) the trial court erred in granting a no-evidence summary judgment.

We affirm the trial court's judgments.

## I. BACKGROUND[1]

---

[1] This case is before this Court on transfer from the Third Court of Appeals in Austin pursuant to an

2

On May 3, 2006, Lerin Hills submitted an application for a Texas Pollutant Discharge Elimination System permit. *See* Tex. Water Code Ann. § 26.027 (West, Westlaw through 2013 3d C.S.) (providing that the Commission may issue permits for the discharge of waste or pollutants into or adjacent to water in the state). This application sought permission to discharge effluent from a new wastewater treatment facility that would serve a planned 1,475 single-family housing development in Kendall County, Texas. The application proposed discharging the treated wastewater into an unnamed tributary, then to the headwaters of an impoundment on Deep Hollow Creek, then to Deep Hollow Creek, then to Frederick Creek, then to Upper Cibolo Creek in Segment Number 1908 of the San Antonio River Basin.

The Commission issued a public notice after it received Lerin Hills's application and declared it complete. Appellant Rick Wood, whose property was located near the proposed site, requested a contested case hearing before an ALJ on the application. The Commission granted Wood's request for hearing on the following issues:

1. Whether the proposed effluent discharge would be in compliance with regulations intended to protect ground water and surface water;

2. Whether the effluent limitation in the draft permit would protect water quality and the designated uses of the receiving waters;

3. Whether the permit would authorize Lerin Hills to discharge the appropriate amount of wastewater based on the service area projections;

4. Whether the proposed facility would comply with the siting requirements set forth in 30 Texas Administrative Code section 309.12;

---

order issued by the Supreme Court of Texas. *See* Tex. Gov't Code Ann. § 73.001 (West, Westlaw through 2013 3d C.S.).

5. Whether the facility would meet the rule requirements intended to reduce nuisance odor conditions;

6. Whether Lerin Hills's compliance history was such that the permit should not be issued; and

7. Whether certain requirements of the draft permit regarding plant operator and safety concerns were sufficient to ensure compliant plant operations.

Notably, the Commission did not grant a hearing on Wood's question of whether regionalization, or need, was at issue. During the public comment period, Wood contended that there was not a need for this additional wastewater treatment facility because there was another treatment facility in the region that could handle the anticipated discharge from the new planned development. The Commission chose, however, not to submit this issue to the ALJ for a hearing.

On November 18–20, 2008, an ALJ from the SOAH, Judge Shannon J. Kilgore, held a live hearing on the aforelisted issues with respect to Lerin Hills's application. Several water quality experts testified: Charles Marshall testified for the Commission; Dr. James Miertschin, an environmental engineer, and Paul Price, an aquatic biologist, testified for Lerin Hills; Peter Schaefer, an aquatic scientist, testified for the Commission's Executive Director; and Dr. Roger Lee testified for Wood. The ALJ subsequently issued a proposal for decision (PFD) which concluded that Lerin Hills met its burden of proof on all of the contested issues save one: whether the permit met the Commission's antidegradation rule. *See* 30 Tex. Admin. Code § 307.5 (West, Westlaw 2013 though 3d C.S.). This rule provides that changes that can affect the fishable/swimmable quality cannot be allowed unless the applicant can show to the Commission's satisfaction that the lowering of water quality is necessary for important

4

economic or social development. *Id.* The Commission's Executive Director and Lerin Hills filed extensive exceptions to the PFD on the antidegradation issue.

On May 20, 2008, the Commission held a full hearing on Lerin Hills's application. Chairman Buddy Garcia, Commissioner Dr. Bryan Shaw, and Commissioner Larry Soward presided at the hearing. After deliberation, wherein the Commission heard testimony from the ALJ, representatives from Lerin Hills, Wood, and the Commission's Executive Director, and considered the evidence from the SOAH hearing, the Commission voted to reverse the ALJ recommendation on the antidegradation issue. The Commission requested that Lerin Hills's counsel, Danny Worrell, draft an order modifying the ALJ's proposed order to reflect their new position on antidegradation. At the next Commission meeting on June 26, 2009, attorney Worrell presented the draft order and explained the modifications made to the ALJ's PFD. Wood did not attend this public hearing and was not represented by counsel, either. Ultimately, the Commission voted to adopt this order. Chairman Garcia signed the final order on July 7, 2009.

Wood appealed the adoption of the final order in a Travis County District Court. In his appeal, Wood also added an Open Meetings Claim violation, arguing that the Commission violated the Texas Open Meetings Act when it accepted Lerin Hills's proposed modifications when they were not based in the record. The trial court granted the Commission's no-evidence summary judgment motion on Wood's Open Meetings claim and upheld the Commission's decision and findings. Wood subsequently appealed.

5

## II.  STANDARD OF REVIEW

"Judicial review of an administrative order following a contested-case proceeding is governed by the substantial evidence rule."  *Citizens Against Landfill Location v. Tex. Comm'n on Envtl. Quality*, 169 S.W.3d 258, 263 (Tex. App.—Austin 2005, pet. denied). The Texas Government Code provides the following guidance regarding application of the substantial evidence rule:

> If the law authorizes review of a decision in a contested case under the substantial evidence rule or if the law does not define the scope of judicial review, a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but:
>
> > (1)  may affirm the agency decision in whole or in part; and
> >
> > (2)  shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
> >
> > > (A)  in violation of a constitutional or statutory provision;
> > >
> > > (B)  in excess of the agency's statutory authority;
> > >
> > > (C)  made through unlawful procedure;
> > >
> > > (D)  affected by other error of law;
> > >
> > > (E)  not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or
> > >
> > > (F)  arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

TEX. GOV'T CODE ANN. § 2007.174 (West, Westlaw through 2013 3d C.S.).

Under the substantial evidence rule, appellate courts review the evidence as a whole to determine if reasonable minds could have reached the same conclusion as the

6

agency. *Citizens*, 169 S.W.3d at 264 (citing *H.G. Sledge, Inc. v. Prospective Inv. & Trading Co.*, 36 S.W.3d 597, 602 (Tex. App.—Austin 2000, pet. denied)). A court may not substitute its judgment for that of the agency and may only consider the record on which the agency based its decision. *Id.* (referring to TEX. GOV'T CODE ANN. § 2001.174). We must not determine whether the agency reached the correct conclusion, but whether there is some basis in the record for the agency's action. *Id.*; *see City of El Paso v. Pub. Util. Comm'n*, 883 S.W.2d 190, 204 (Tex. 1994). "We presume that the agency's findings, inferences, conclusions, and decisions are supported by substantial evidence, and the burden to prove otherwise is on the appellant." *Citizens*, 169 S.W.3d at 264 (citing *Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 452 (Tex.1984)). The agency's decision, in this case the Commission's decision, should only be reversed if the party challenging the decision demonstrates that the lack of substantial evidence prejudiced the party's substantial rights. *Id.*

## III. ISSUES ON APPEAL

### A. The Decision Not to Refer the Regionalization Issue to the SOAH

Wood argues that the Commission erred when it decided not to refer the regionalization issue to the SOAH. In other words, Wood contends that the Commission should have allowed the SOAH to determine whether there was a need for the additional wastewater treatment facility, given that there existed another facility in the region.

Section 26.003 of the Texas Water Code encourages and promotes "the development and use of regional and areawide waste collection, treatment, and disposal

7

systems." TEX. WATER CODE ANN. § 26.003 (West, Westlaw through 2013 3d C.S.).

Section 5.556(d) of the Texas Water Code deals with the choice to refer issues to the

SOAH. *See id.* § 5.556(d) (West, Westlaw through 2013 3d C.S.). The statute, in

relevant part, provides as follows:

> The commission may not refer an issue to the State Office of Administrative Hearings for a hearing unless the *commission determines* that the issue:
>
> (1)    Involves a disputed question of fact;
>
> (2)    Was raised during the public comment period; and
>
> (3)    Is relevant and material to the decision on the application.

*Id.* (emphasis added). In addition, section 5.556(e) provides:

> If the commission grants a request for a contested case hearing it shall:
>
> (1)    Limit the number and scope of the issues to be referred to the State Office of Administrative Hearings for a hearing; and
>
> (2)    Consistent with the nature and number of the issues to be considered at the hearing, specify the maximum expected duration of the hearing.

*Id.* at § 5.556(e) (West, Westlaw through 2013 3d C.S.).

A plain reading of the statute reveals that the decision to refer an issue to the

SOAH is discretionary and at the Commission's will. The Commission "determines"

whether the issue "involves a disputed question of fact," "was raised during the public

comment period," and "is relevant and material." *Id.* at § 5.556(d). Here, it is

undisputed that Wood raised the issue of regionalization, or need, during the public

comment period. Thus, the only questions at issue were whether regionalization

involved a disputed question of fact and if it was relevant and material to the

Commission's decision to grant the application. *Id.*

8

In this case, the Commission determined that the need for an additional facility was not in question. We look to Lerin Hills's original application, wherein it identified the Tapatio Springs Service Company wastewater treatment center as an existing facility located within three miles of the proposed development. Testimony from the Commission's Executive Director revealed that the Tapatio Springs facility was only authorized to treat 150,000 gallons of domestic wastewater daily; Lerin Hills requested the ability to treat 500,000 gallons of effluent per day. The issue of geography also created a problem. According to the Executive Director,

> The proposed facility is located on the opposite side of a major topographic ridge from the Tapatio Springs Service Company facility. If the Lerin Hills permit is issued, wastewater would be collected in gravity sanitary sewers and then pumped at relatively low pressures to the proposed facility; however[,] for Lerin Hills to connect to the Tapatio Springs Service Company facility, wastewater would first have to be centrally collected in the lower part of the Lerin Hills area and then pumped over the ridge, requiring a vertical lift over 200 feet. Lerin Hills indicates this is undesirable because it will increase costs for the future Lerin Hills homeowners and it will increase the risk of raw sewage spills due to higher pressure in the sewage force main.

We conclude that the Commission did not err when it declined to grant a hearing on the question of regionalization, or need. Section 5.556(d) of the Texas Water Code gives the Commission discretion to determine which issues should be considered for hearing, and in light of the foregoing concerns regarding the limited capacity and geographic challenges of using another wastewater facility in the vicinity, we hold that the Commission wielded its discretion appropriately. *Id.*; *see State v. Pub. Utility Comm'n of Tex.*, 883 S.W.2d 190, 196 (providing that "the contemporaneous construction of a statute by the administrative agency charged with its enforcement is entitled to great weight") (referring to *Dodd v. Meno*, 870 S.W.2d 4, 7 (Tex. 1994) &

9

*Tarrant Appraisal Dist. v. Moore*, 845 S.W.2d 820, 823 (Tex. 1993)).   We overrule this issue.[2]

## B.      The Commission's Tier 2 Antidegradation Standard

Wood also contended that the Commission erred when it held that Lerin Hills met the Commission's Tier 2 antidegradation standard.   The Texas Administrative Code sets forth this standard:

> Tier 2. No activities subject to regulatory action that would cause degradation of waters that exceed fishable/swimmable quality are allowed unless it can be shown to the commission's satisfaction that the lowering of water quality is necessary for important economic or social development. Degradation is defined as a lowering of water quality by more than a *de minimis* extent, but not to the extent that an existing use is impaired. Water quality sufficient to protect existing uses must be maintained. Fishable/swimmable waters are defined as waters that have quality sufficient to support propagation of indigenous fish, shellfish, terrestrial life, and recreation in and on the water.

30 TEX. ADMIN. CODE ANN. § 307.5.

"In Texas, the TCEQ has the primary authority to establish surface water quality standards, which it implements, in part, in its permitting actions."   *Tex. Comm'n on Envtl. Quality v. City of Waco*, 413 S.W.3d 409, 411 (Tex. 2013).   A review of the record shows that the Commission measures water quality issues by two standards:   the quantitative and the narrative standards.   *Id*. at 411, n.3 (indicating that the Commission has defined "narrative" water quality standards as "qualitative, somewhat subjective assessments" compared to "quantitative or numeric measures").   In its brief, the Commission further explained:

---

[2] We further note that the Commission did, though, honor Wood's request by granting him a hearing on seven other issues raised during the public comment period.   By limiting the number of issues it heard, the Commission complied with its duty to "limit the number and scope of the issues to be referred" to the SOAH.   TEX. WATER CODE ANN. § 5.556(e) (West, Westlaw through 2013 3d C.S.).

Narrative standards apply to parameters such as nutrients that are harder to quantify. Unlike many water-quality criteria, which are based on a certain toxicity threshold determined by testing, the variability of ecosystems makes developing a cause/effect relationship between nutrient concentrations and ecological factors more difficult to readily determine through testing. Hence, a narrative standard rather than a numeric standard is applied.

In comparison, the Commission referred to its "Implementation Procedures," which uses numerical data for elements that are easy to quantify, such as dissolved oxygen, total dissolved solids, sulfate, chloride, pH, temperature, toxic pollutants, and bacteria, among others. *See* TEX. COMM'N ON ENVIRONMENTAL QUALITY, *Procedures to Implement the Texas Surface Water Quality Standards* (June 2010), *available at* http://www.tceq.state.tx.us/assets/public/permitting/waterquality/standards/docs/june_20 10_ip.pdf (last visited Dec. 2, 2014).

According to its brief, the Commission measures antidegradation under the narrative standard. As applied to this case, that means that the Commission would require qualitative, subjective evidence to determine whether Lerin Hills's proposed facility would "lower[] . . . water quality by more than a *de minimis* extent, but not to the extent that an existing use is impaired." 30 TEX. ADMIN. CODE ANN. § 307.5.

At the May 20, 2009 Commission meeting, the ALJ confirmed that she used the more strict, quantitative standard to determine whether antidegradation would occur if the Lerin Hills facility were approved. She testified as follows:

> Both Lerin Hills and the ED have excepted to my analysis and findings concerning the antidegradation rule. They're both critical of my characterization of the rule and in particular tier 2 as very stringent and challenging. They suggest that I have over-read the rule. In addition[,] they assert that I have applied a standard of proof that's someho[w] stricter than the preponderance of the evidence standard. . . . I do believe that this is a strict and not a lenient rule. . . .

11

. . . .

> Mr. Price, the biologist, opined that nutrients in the discharge would not have an adverse effect on the plant life in the impoundments at Deep Hollow Creek. . . . Mr. Price [, though,] was not in command of the only quantitative data that exists that attempts to predict the effects on the receiving stream of the nutrients in this discharge. [He] was not a very persuasive witness. That leaves the opinion of Dr. Miertschin [who] offered a general opinion that the increased plant and algal growth will not be significant. His opinion was quite conclusory.

The ALJ explained that she felt that the experts for Lerin Hills, Mr. Price and Dr. Miertschin, were unable to quantify their conclusions that the effluent would lower water quality by more than a de minimis extent. Accordingly, the ALJ maintained that these expert opinions were incompetent because they were unexplained by numerical data.

Lerin Hills, at the same May 9th hearing, protested the ALJ's requirement of the quantitative standard to measure antidegradation. Counsel for Lerin Hills stated that the use of numeric proof was neither required "by the rules, the Texas Surface Water Quality Standards or the implementation procedures." At the hearing, Chairman for the Commission, Buddy Garcia, confirmed that "we [the Commission] do use a narrative criteria here, and have." Chairman Garcia expressed that, although the Commission would eventually prefer to move toward establishing numerical criteria to determine antidegradation, it was not the current standard used to measure this tier 2 requirement. Accordingly, the Commission overruled the ALJ's recommendation because it held that the ALJ used the incorrect standard to measure the proposed treatment facility's impact on water quality.

Wood urges us to consider *State v. Mid-South Pavers* in support of his contention that the ALJ's recommendation should stand. *See* 246 S.W.3d 711 (Tex. App.—Austin 2007, pet. denied). We find *Mid-South Pavers* inapposite on this matter. In

12

*Mid-South*, a case involving a highway construction contract, the Austin Court of Appeals partially reversed a decision by the Texas Department of Transportation (TxDOT) because TxDOT overruled an ALJ's finding on witness credibility. *Id.* at 726. The Third Court of Appeals ruled that "by resolving conflicts and credibility issues in disputed evidence, the executive director [of TxDOT] has essentially stepped into the shoes of the factfinder and reweighed the evidence to reach a specific result. This is not what the legislature envisioned. . . ." *Id.*

The Commission did not do that here. Instead, the Commission held that the ALJ used the incorrect standard to measure the possible antidegradation of water quality. The ALJ testified that she used the stricter, quantitative standard to measure antidegradation when Commission chair Garcia confirmed that the Commission has, to date, only used the narrative standard in such decisions. And the testimony from Lerin Hills's experts Dr. Miertschin and Mr. Price revealed that while water chemistry would change with the construction of a new water treatment facility, the changes would have a de minimis impact on water quality. *See* 30 TEX. ADMIN. CODE ANN. § 307.5. This evidence thus met the narrative standard.

Using the substantial evidence standard, we review the evidence as a whole to determine if reasonable minds could have reached the same conclusion as the agency in the disputed action. *Citizens*, 169 S.W.3d at 264. We may not determine whether the Commission reached the correct conclusion, but whether there is some basis in the record for its action. *Id.*; *see City of El Paso*, 883 S.W.2d at 204. Here, the Commission's decision was based on the ALJ's use of an incorrect standard, not on its re-evaluation of a witness's credibility. *See Mid-South Pavers*, 246 S.W.3d at 726.

13

Because we hold that there is substantive evidence to uphold the Commission's decision to overturn the ALJ's decision on antidegradation, *see Citizens*, 169 S.W.3d at 264, we overrule this issue.

## C.     The Commission's Revision of the ALJ's Proposed Order

Wood presented three reasons why the Commission's revision of the ALJ's proposed order was erroneous:  the Commission allegedly (1) used new "sampling requirements" for the determination of baseline water quality; (2) used information outside the record; and (3) failed to provide a sufficient "explanation of changes" to the ALJ's order.   We analyze each complaint in turn.

### 1.     New Sampling Requirements

Wood argued that the Commission erred when it used "new sampling requirements" for the determination of baseline water quality after the close of the contested hearing.  Although Wood's briefing on this issue is somewhat unclear, we surmise that one of the bases Wood has for this complaint is that the Commission determined that a narrative, not quantitative, standard was used to measure the antidegradation requirement for the permit's approval.   As more clearly explained in section III(B) of this opinion, we conclude that this change was not a "new sampling requirement" but rather the Commission's decision to use the customary water quality standard.   Because we concluded that there existed substantial evidence to uphold the Commission's decision to change from a quantitative to narrative standard, *see Citizens*, 169 S.W.3d at 264, we upheld this Commission decision.

Another complaint Wood has with regard to sampling requirements was the Commission's decision to disregard Dr. James Miertschin's sampling data.   Dr.

14

Miertschin testified that he took one set of samples when he conducted his investigation of Lerin Hills's proposed discharge route. The ALJ used this sampling data to establish several findings of fact in her PFD, specifically, findings of fact numbers 38, 40, 43, and 46.[3] The Commission, however, chose to disregard these samples. In its final order, the Commission explained its decision as follows:

> The Commission determined that the ALJ's inclusion of "background" information in certain Findings of Fact was not appropriate, because that "background" was based on a single set of samples. Background developed in accordance with EPA guidance and TCEQ practices requires more extensive sampling to be correctly determined. Therefore, what the ALJ proposed as Finding of Fact Nos. 38, 40, 43, and 46 have been deleted and the remaining Findings of Fact have been renumbered accordingly.

The Commission's Executive Director, in his exceptions to the ALJ's PFD, pointed out that this was a correct move because "if a permitee collects samples to obtain site-specific data, at least 30 samples must be taken, but the TCEQ would prefer 30–50 samples to ensure that there are at least 30 valid data points and to get a more statistically reliable number." Dr. Miertschin further testified that his single set of

---

[3] Here are the relevant findings of fact from the ALJ's Proposal for Decision:

Finding of Fact No. 38: The phosphorus concentrations in the Hahnfeld pond and SCS impoundment after the commencement of the proposed discharge could be as much as 150% to 1,200% of measured background.

Finding of Fact No. 40: The record in this case includes no attempt to estimate quantitatively the amounts of phosphorus that will be biologically available in the stream over time as the discharge continues.

Finding of Fact No. 43: The record in this case includes no attempt to estimate quantitatively the amounts of algal and plant growth that may result from the increased nutrient loading from the proposed discharge.

Finding of Fact No. 46: Lerin Hills has not shown that any lowering of water quality resulting from the proposed discharge would be necessary for an important economic or social development.

samples were not taken during critical conditions of warm temperatures and base flow conditions. This testimony provides yet another reason why this single sampling of data was not representative of normal conditions of the receiving stream. And, again, because we have held that a narrative standard should have been used in this case, quantitative sampling was not necessary.

Under the substantial evidence test, "we presume that the agency's findings, inferences, conclusions, and decisions are supported by substantial evidence, and the burden to prove otherwise is on the appellant." *Citizens*, 169 S.W.3d at 264; *Charter Med.-Dallas, Inc.*, 665 S.W.2d at 452. Here, we find there was substantial evidence in the record for the Commission's decision to discount sampling data that was unnecessary under the narrative standard and/or unreliable due to the small sample size.

## 2. Amended Findings of Fact

Wood further contends that the Commission's amendments to the ALJ's Findings of Fact No. 32, 36, 37, 38, 39, 40, and 43 were based on information outside the record made before the administrative law judge in violation of section 2003.047(m) of the Texas Government Code.[4] TEX. GOV'T CODE ANN. § 2003.047(m) (West, Westlaw

---

[4] We set forth the relevant findings of fact from the ALJ's Proposal for Decision:

Finding of Fact No. 32: Modeling of the effects of the proposed discharge indicates that the lowest DO level in Deep Hollow Creek would be between 5.03 mg/L and 5.27 mg/L, compared to a presumed background of 6.25 mg/L.

Finding of Fact No. 36: Predicted concentrations of phosphorus in the SCS impoundment would be 0.42 mg/L, 0.28 mg/L, 0.12 mg/L, and 0.05 mg/L (upstream to downstream), compared to the measured background of 0.035 mg/L or the presumed background of 0.05 mg/L.

Finding of Fact No. 37: Predicted concentrations of phosphorus in the Hahnfeld pond and SCS impoundment after the commencement of the proposed discharge could be as much

16

through 2013 3d C.S.).   Section 2003.047(m) provides as follows:

> Except as provided in Section 361.0832, Health and Safety Code, the commission shall consider the proposal for decision prepared by the administrative law judge, the exceptions of the parties, and the briefs and argument of the parties.   The commission may amend the proposal for decision, including any finding of fact, but any such amendment thereto and order shall be based solely on the record made before the administrative law judge.   Any such amendment by the commission shall be accompanied by an explanation of the basis of the amendment.   The commission may also refer the matter back to the administrative law judge to reconsider any findings and conclusions set forth in the proposal for decision or take additional evidence or to make additional findings of fact or conclusions of law.   The commission shall serve a copy of the commission's order, including its finding of facts and conclusions of law, on each party.

*Id.*   In his brief, Wood argues that the Commission did not base its amended order "solely on the record made before the administrative law judge."   *Id.*   He further asserts that the amended order was not "accompanied by an explanation of the basis of the amendment."   *Id.*   We address each specifically referenced change.

### a. Finding of Fact Number 32 Regarding Dissolved Oxygen Levels

Wood argues that the Commission's change to the ALJ's finding of fact number 32 regarding dissolved oxygen levels was not supported by evidence or adequately

---

as 150% to 1,200% of measured background.

Finding of Fact No. 38:   The phosphorus concentrations in the Hahnfeld pond and SCS impoundment after the commencement of the proposed discharge could be as much as 150% to 1,200% of measured background.

Finding of Fact 39:   Lerin Hills' phosphorus modeling uses a uniform decay rate to attempt to reflect removal of phosphorus from the water column, but the modeling does not attempt to reflect cumulative phosphorus loading over time.

Finding of Fact No. 40:   The record in this case includes no attempt to estimate quantitatively the amounts of phosphorus that will be biologically available in the stream over time as the discharge continues.

Finding of Fact No. 43:   The record in this case includes no attempt to estimate quantitatively the amounts of algal and plant growth that may result from the increased nutrient loading from the proposed discharge.

17

explained. The ALJ's finding originally read, "Modeling of the effects of the proposed discharge indicates that the lowest DO level in Deep Hollow Creek would be between 5.03 mg/L and 5.27 mg/L, compared to a presumed background of 6.25 mg/L." The Commission's final order reads, "Modeling of the effects of the proposed discharge indicates that the lowest DO level in Deep Hollow Creek would be between 5.03 mg/L and 5.27 mg/L."

We look to the ALJ's original PFD and find that she held that the "presumed background of 6.25 mg/L" came from Dr. Miertschin's testimony and findings. Based on the Commission's decision to disregard Dr. Miertschin's sampling data because it was based on a single set of samples, *see* discussion at section III(C)(1) *supra*, we find there is substantial evidence in the record to support this deletion of language. As the Commission pointed out, "background developed in accordance with EPA guidance and TCEQ practices requires more extensive sampling to be correctly determined." Dr. Miertschin's sampling did not meet the Commission's requirements for scientific sampling data.

In its "Explanation of Changes" in its final order, the Commission stated that it "eliminate[d] language inconsistent with the Commission's decision . . . [to] reflect[] that the Applicant has satisfied all currently applicable water quality requirements . . . ." We hold that this change is supported by substantial evidence in the record and explained adequately.

### b. Findings of Fact Numbers 36 Through 40 Regarding Phosphorus Levels

Findings of Fact 36, 37, 38, 39, and 40 dealt with the changes in phosphorus levels that would arise in the affected water bodies should the Lerin Hills application be

granted. In its final order, the Commission explained that the ALJ erred by requiring Lerin Hills to "present quantitative data on cumulative loading of phosphorus over time and resulting biomass." The Commission determined that such data was not required for Lerin Hills to meet the current narrative standards for nutrients. Again, based on the testimony and evidence in the record, we find that these changes were supported and explained sufficiently.

### c. Finding of Fact Number 43 Regarding Algal and Plant Growth

Wood also argued that the Commission's deletion of the ALJ's Finding of Fact Number 43 was error. This finding provided that, "the record in this case includes no attempt to estimate quantitatively the amounts of algal and plant growth that may result from the increased nutrient loading from the proposed discharge." The Commission stated that this finding was deleted because the narrative, not quantitative, standard was appropriate to measure algal and plant growth. "The Commission determined that such data was not required in order for the Applicant to meet the current narrative standards for nutrients and that such data was not required. . . ." We hold that this statement was supported by substantial evidence in the record and adequately explains the Commission's modification. *See* TEX. GOV'T CODE ANN. § 2007.174; *see also* section III(B), *supra*.

### d. Conclusion

In sum, the Commission's changes to the ALJ's findings are supported by substantial evidence in the record and explained sufficiently to meet the requirements of section 2003.047(m) of the government code. *See* TEX. GOV'T CODE ANN. § 2003.047(m). Because reasonable minds could have reached the same conclusion as

19

the agency in this disputed action, *see Citizens*, 169 S.W.3d at 264, we conclude that these amendments should be upheld.

## 3. The Alleged Lack of Specificity in the Commission's "Explanation of Changes"

Finally, Wood claims that the Commission's final sentence in paragraph 2 of its "Explanation of Changes" violated sections 2001.058(e) and 2003.047(m) of the Texas Government Code for want of specificity. TEX. GOV'T CODE ANN. § 2001.058(e), 2003.047(m) (West, Westlaw through 2013 3d C.S.). The sentence reads as follows:

> In addition, the Commission modified the Finding of Fact Nos. 31–32, 36–38, 40, and 44, Conclusion of Law Nos. 6–7, and Ordering Provision No. 15 to eliminate language inconsistent with the Commission's decision

---

[5] We set forth the relevant findings of fact and conclusions of law from the Commission's Final Order dated July 7, 2009:

Finding of Fact No. 31: The draft permit would ensure that the narrative standards applicable to all segments of the receiving stream would be met.

Finding of Fact No. 32: Modeling of the effects of the proposed discharge indicates that the lowest DO level in Deep Hollow Creek would be between 5.03 mg/L and 5.27 mg/L.

Finding of Fact No. 36: Predicted concentrations of phosphorus in the SCS impoundment would be 0.42 mg/L, 0.28 mg/L, 0.12 mg/L, and 0.05 mg/L (upstream to downstream).

Finding of Fact No. 37: Predicted concentrations of phosphorus in the Hahnfield Pond would be 0.04 mg/L and 0.03 mg/L.

Finding of Fact No. 38: Lerin Hills' phosphorus modeling uses a uniform decay rate to attempt to reflect removal of phosphorus from the water column.

Finding of Fact No. 40: An increase in plant and algal growth as a result of the proposed Lerin Hills discharge is likely; however, with the effluent limit of 0.5 mg/L (daily average) for total phosphorus, the increase will be de minimis.

Finding of Fact No. 44: Lerin Hills demonstrated that there would not be lowering of the water quality of Deep Hollow Creek, Frederick Creek, and Upper Cibolo Creek by more than a de minimis extent as a result of the proposed discharge.

Conclusion of Law No. 6: The draft permit would ensure that the narrative standard applicable to the immediate receiving stream (the unnamed tributary), and to Deep Hollow Creek, Frederick Creek, and Upper Cibolo Creek would be met. 30 Tex. Admin. Code 307.4[.]

Conclusion of Law No. 7: The evidence supports a conclusion that, as to nutrients and

20

on this matter and to incorporate new language that reflects that the applicant has satisfied all currently applicable water quality requirements and that the Commission is issuing the ED's draft permit, as modified by Explanation of Changes No. 3, below.

Section 2001.058(e) provides that a state agency may change a finding of fact or conclusion of law made by an ALJ if the agency determines: (1) the ALJ did not properly apply or interpret applicable law; (2) an administrative decision the ALJ relied upon is incorrect or should be changed; or (2) a technical error should be corrected. *See id.* § 2001.058(e). When making such a change, the agency "shall state in writing the specific reason and legal basis for a change made under this subsection." *Id.* And, as we noted previously, section 2003.047(m) provides additional authority for this contention; it provides that a commission may amend an ALJ's decision as long as it is "based solely on the record" and is "accompanied by an explanation of the basis for the amendment." *Id.* § 2003.047(m).

We disagree with Wood's interpretation of the Commission's modifications to the order. Before the disputed final sentence, the Commission clearly explained its reasoning for the changes:

> The Commission determined that the ALJ misapplied the Commission's policies and rules related to antidegradation, as set forth in 30 TEX. ADMIN. CODE ch. 307 and the "Procedures to Implement the Texas Surface Water Quality Standards", by requiring the Applicant to present quantitative data on cumulative loading of phosphorus over time and resulting biomass. The Commission determined that such data was not required in order for the Applicant to meet the current narrative standards for nutrients and that such data and modeling were not appropriately required of an applicant until the agency has an opportunity to develop an numeric standard in the future, after providing sufficient public notice and sound scientific vetting of that proposed new standard. The Commission determined that the

their effects on surface water quality, the draft permit and proposed discharge would satisfy the requirements of the Commission's antidegradation rule in connection with the waters of Deep Hollow Creek, Frederick Creek, and Cibolo Creek. 30 Tex. Admin. Code 307.5.

evidence in the record shows that the Applicant has satisfied the applicable narrative criteria for nutrients in this matter.

We conclude that this explanation meets section 2001.058(e) of the government code because it explains that the ALJ did not properly apply the correct narrative standard to review antidegradation changes. *See id.* § 2001.058(e)(1) (providing that an agency may amend a finding if "the ALJ did not properly apply or interpret applicable law"). The Commission's change, therefore, was a technical error that was properly corrected. *Id.* § 2001.058(e)(3). We further hold that the explanation meets section 2003.047(m) because the Commissions amendment is firmly based in the record—there was ample testimony and evidence showing that the narrative standard was the proper standard to apply. *Id.* § 2003.047(m).

### 4. Conclusion

In sum, Wood presented three reasons why the Commission erred in revising the ALJ's proposed order. He complained that the Commission (1) used new sampling requirements to determine baseline water quality; (2) used information outside the record; and (3) failed to specify the basis for its changes in its "explanation of changes." Having determined that there was substantial evidence in the record for the Commission to make its changes to the ALJ's order, *see* TEX. GOV'T CODE ANN. § 2007.174, we overrule this issue.

### D.     The No-Evidence Summary Judgment on Wood's Open Meetings Act Claim

Wood filed an Open Meetings Act Claim, among other claims, when he appealed to a Travis County District Court. In his petition, Wood alleged that the Open Meetings Act was violated when the chairman of the TCEQ "adopted a private position espoused by another member but never voted upon in an open meeting." The Commission filed a

no-evidence motion for summary judgment on this claim, which the district court granted.

### 1. Applicable Law and Standard of Review

In general, meetings of governmental bodies must be open to the public. *See id.* § 551.002 (West, Westlaw 2013 through 3d C.S.). "The [Open Meeting] Act's purposes are to provide public access to and increase public knowledge of governmental decision-making." *Tex. State Bd. of Pub. Accountancy v. Bass*, 366 S.W.3d 751, 759 (Tex. App.—Austin 2012, no pet.) (citing *City of San Antonio v. Fourth Ct. of Appeals*, 820 S.W.2d 762, 765 (Tex. 1991)). "The law requires openness, not secrecy, when a state agency makes its decision in a contested administrative case." *Id.* One objective of the Open Meetings Act is to provide civil remedies for violations of its meeting-notice requirements. *City of Elsa v. Gonzalez*, 325 S.W.3d 622, 627 (Tex. 2010) (citing TEX. GOV'T CODE ANN. §§ 551.141–.142 (West, Westlaw through 2013 3d C.S.)). "Any action taken by a governmental body in violation of the Open Meetings Act is voidable, and 'an interested person . . . may bring an action by mandamus or injunction to stop, prevent, or reverse a violation of threatened violation.'" *Id.*

Here, the trial court granted a no-evidence summary judgment in favor of the Commission on Wood's alleged Open Meetings Act claim. "In reviewing a no-evidence summary judgment, we review the evidence in the light most favorable to the respondent against whom the summary judgment was rendered." *See Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005)). If the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact, a no-evidence summary judgment cannot properly be granted. *Id.* (citing *Reynosa v. Huff*, 21 S.W.3d 510, 512 (Tex. App.—San Antonio

2000, no pet.)).

## 2. Discussion

The Commission held two hearings on the Lerin Hills application. The first hearing was held on May 20, 2009. At this hearing, Chairman Buddy Garcia stated the following on the record:

> We do use a narrative criteria here, and have. I know that we're moving toward the numerical criteria. I think a logical conclusion has been reached here. Any chemistry change would probably lead us be unable under our current rules to adopt any permits in the future if that was the case, and specifically no discharge permit, I think, will ever be allowed. But right now, being able to know what we know in front of us, that at least the Chair is interested in reversing the ALJ's recommendation . . . .

Commissioner Dr. Bryan W. Shaw echoed Chairman Garcia's sentiments:

> I agree with reversing the ALJ's decision. I understand the basis for where she's trying to go, but I think that's basically where we're endeavoring to develop the standards and the processes to improve that methodology to better inform it, and I don't think we're there yet. I think it's a noble goal to have but I don't think it fits within what our current rules require. . . .

At the conclusion of this hearing, Commissioner Shaw moved to continue the matter to the Commission's June 26, 2009 hearing. He also moved to request Lerin Hills to "modify the ALJ's proposed order to reflect the Commission's decision on antidegradation in accordance with the Commission's discussions."

The second hearing was held on June 26, 2009. At this hearing, Lerin Hills's attorney went on the record to explain the revisions made to the ALJ's proposed order. He stated that the revisions to the findings of fact could be separated into two general categories: (1) the deletion of language indicating that there was no quantitative evidence in the record regarding the antidegradation standards, and (2) deletions of findings that compared constituents to background levels. He elaborated:

24

The applicant's rationale for making these revisions is as follows. Reference to findings to lack of quantitative evidence of either nutrient loading over time or algal and plant growth is not required under TCEQ rules and policy for compliance with the antidegradation standard since it's a purely narrative standard and that is the basis of the Commission's decision in this case. Secondly, comparison to background levels of constituents is erroneous because in this case they were based on a single sample or estimate and TCEQ policy and rules and guidance requires numerous samples to accurately determine the background concentration of a substance in an aquatic system.

Neither Mr. Wood nor a representative of his were present at this meeting. The attorney for the Commission's Executive Director, though, was present and concurred with Lerin Hills's changes.

The Commission issued the final order granting the application on July 7, 2009. This order was drafted by the Commission's General Counsel. A review of the order shows that it reflects the thought-making process the Commissioners exhibited at both the May 20th and June 26th meetings. In particular, the order's "Explanation of Changes" contains a detailed reasoning encompassing the Commissioners' statements and explaining why the Commission chose to approve Lerin Hill's permit application. Even reviewing the evidence in the light most favorable to Wood, *see Smith*, 288 S.W.3d at 424, we cannot say that there was a violation of the Texas Open Meetings Act under these facts. We find no evidence in the record regarding Wood's allegations that the Open Meetings Act was violated because Chairman Garcia "adopted a private position espoused by another member but never voted upon in an open meeting." The discussions, and ensuing decisions, of the Commission were matters of public record. We uphold the trial court's summary judgment on this matter and overrule this issue.

## IV. CONCLUSION

Having overruled all of Wood's issues on appeal, we affirm the trial court's judgment.

/s/ Gina M. Benavides
GINA M. BENAVIDES,
Justice

Delivered and filed the
5th day of March, 2015.