**Affirmed and Opinion filed December 15, 2016.**



**In The**

# Fourteenth Court of Appeals

---

### NO. 14-15-00031-CV

---

### R.E. JANES GRAVEL COMPANY, Appellant

### V.

### THE TEXAS COMMISSION ON ENVIRONMENTAL QUALITY, ITS EXECUTIVE DIRECTOR, RICHARD A. HYDE, ITS COMMISSIONERS BRYAN SHAW AND TOBY BAKER, AND THE CITY OF LUBBOCK, Appellees

---

**On Appeal from the 345th District Court
Travis County, Texas
Trial Court Cause No. D-1-GN-13-000150**

---

### O P I N I O N

Appellee, The City of Lubbock ("the City"), applied to appellee, The Texas Commission on Environmental Quality ("the Commission"), for an amendment to an existing permit, which would authorize the City to use a portion of the Brazos River to convey treated wastewater effluent from a discharge point to a point downstream, where the effluent would be diverted for beneficial purposes.

Appellant, R.E. Janes Gravel Company ("Janes"), whose property is downstream from the proposed diversion point, contested the application. The Commission issued an order granting the amended permit. In the present suit, Janes sought judicial review of that order and sued the City and the Commission, as well as its executive director—Richard A. Hyde, and its commissioners—Bryan Shaw and Toby Baker, all in their official capacities.[1] A district court rendered judgment for appellees, affirming the Commission's order. We affirm the district court's judgment.

## I. BACKGROUND

The City is located entirely within the Brazos River Basin. However, the City has not historically received its water supply from the Brazos River or its tributaries because of intermittent flows. Rather, the City satisfies its water needs from a combination of imported surface water, groundwater, and reuse of treated wastewater effluent.

The City purchases the surface water from the Canadian River Municipal Water Authority ("CRMWA"). That water, originating in Lake Meredith, is transported by pipeline in the Canadian River Basin to the Brazos River Basin to the City's raw water treatment facility. The City produces the groundwater from wells and also purchases well-produced groundwater from CRMWA.

---

[1] Janes originally sued then-executive director, Zachary Covar, and another then-commissioner, Carlos Rubenstein. According to the Commission, the executive director is now Richard A. Hyde, and Rubenstein is no longer a commissioner, with his former seat now vacant. The Commission requests that we substitute Hyde for Covar and drop Rubenstein as a party. *See* Tex. R. App. P. 7.2(a) (providing that when a public officer is a party in an official capacity to an appeal and ceases to hold office before disposition of the appeal, the public officer's successor is automatically substituted as a party, if appropriate, and subsequent proceedings are to be in the name of the substituted party). Janes does not oppose the Commission's request or dispute its assertions regarding the changes. Accordingly, we grant the Commission's request and refer to the current executive director and commissioners as though they were the parties from the outset.

2

Additionally, sewage from customers is returned to the City's wastewater treatment facility where it is converted into treated wastewater effluent (hereinafter "the effluent"). In 1983, the City obtained a permit—No. 3985—authorizing the City to reuse for industrial and agricultural purposes within the Brazos River Basin a maximum of 22,910 acre-feet per year of the effluent derived from the surface water purchased from CRMWA.

In 2001, the City was also granted a wastewater discharge permit, allowing, but not requiring, the City to discharge a maximum of 10,081 acre-feet per year, with a maximum of 9 million gallons per day, of the effluent into the North Fork of the Double Mountain Fork of the Brazos River ("the North Fork") at a point called Outfall No. 001.[2] In May 2003, the City began discharging at Outfall No. 001. As of the 2011 administrative hearing in the present case, the City had never discharged the daily permitted maximum; rather, discharge rates have varied based on usage patterns and amounts discharged at other authorized locations. The discharged effluent has been a varied mixture of the surface-water-based effluent and groundwater-based effluent as the source of the City's water supply has fluctuated.

In 2004, the City applied for an amendment to Permit No. 3985, requesting what is commonly known as a "bed and banks" permit and governed by statute. *See* Tex. Water Code Ann. § 11.042 (West Supp. 2016). The City requested authorization to use the bed and banks of the North Fork to transport the 10,081 acre-feet per year of treated effluent that it is allowed to discharge at Outfall No. 001 to a point 2.7 miles downstream, where an equal amount, less "carriage losses" (the amount lost during conveyance) would be diverted and reused for municipal,

---

[2] The North Fork starts where two ravines converge in Lubbock, Texas. The river then flows away from the City in an east-southeasterly direction.

recreational, industrial, and agricultural purposes. Because the requested diversion is directly tied to the discharge at Outfall No. 001, the City requested permission to divert the maximum it is permitted to discharge although it has never discharged the full authorized amount on a daily basis.[3]

The Commission conducted water-availability, environmental, and conservation analyses. The Commission then prepared a draft permit granting the application.

Janes contested the application. Janes is a family-owned gravel company which has supplied aggregates, including gravel, sand, and limestone, to the City and surrounding areas since the 1950s. Janes has a permit, issued in 1968, to divert up to 450 acre-feet of water annually from the North Fork, at a point downstream from the diversion point referenced in the City's application for an amended permit. According to Janes, its operation depends heavily on its water supply, the North Fork is its primary source of water, and its operations would be affected if that source were compromised. Janes believes that the City diverting 10,081 acre-feet of water upstream will threaten Janes's viability.

The Commission referred the application to the State Office of Administrative Hearings for a contested case hearing. An administrative law judge conducted a hearing during October 2011, at which it considered pre-filed testimony, live testimony, and numerous exhibits. Subsequently, that judge issued a proposal that the Commission grant the application. Janes filed a motion for rehearing which was overruled by operation of law.

---

[3] The City also requested permission to increase the amount of the effluent the City may use from 22,910 acre-feet per year to 32,991 acre-feet per year (an increase of 10,081 acre-feet), but the portion of the order permitting that increase is not challenged by Janes.

4

On October 24, 2012, the Commission issued its final order ("the Order") granting the amended permit—No. 3985A—authorizing the City to convey, via the bed and banks of the North Fork, flows of up to 10,081 acre-feet per year discharged at Outfall No. 001 and divert that amount of existing and future discharges, less carriage losses of .47%, at a certain point downstream. Under the permit, the City may not divert more than the amount discharged and must maintain a water accounting plan to ensure compliance. The order included findings of fact and conclusions of law.

Janes then filed the present suit in a Travis County District Court against the Commission and its executive director and commissioners, seeking judicial review of the Order, as permitted by statute. *See* Tex. Gov't Code Ann. § 2001.171 (West 2016). The City intervened. The trial court conducted a bench trial, at which it admitted the record of the administrative proceeding, as required by statute. *See id.* 2001.175(d), (e) (West 2016). The parties also filed written briefs and presented argument at the bench trial. On October 13, 2014, the trial court signed a final judgment in favor of the City and all the Commission defendants, thereby affirming the Order. Janes appealed to the Third Court of Appeals, and the case was subsequently transferred to our court.[4]

## II. ISSUES AND STANDARD OF REVIEW

On appeal, Janes challenges the Order for two alternative reasons: (1) the Commission failed to comply with Texas law when authorizing the amended permit, or (2) even if the Commission may grant the permit, the Commission failed to properly measure carriage losses.

---

[4] Because of the transfer, we must decide the case in accordance with Third Court of Appeals's precedent if our decision otherwise would have been inconsistent with that court's precedent. *See* Tex. R. App. P. 41.3.

Judicial review of the Commission's order is governed by the substantial-evidence rule set forth in Texas Government Code section 2001.174:

> If the law authorizes review of a decision in a contested case under the substantial evidence rule . . . , a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but:
>> (1) may affirm the agency decision in whole or in part; and
>>
>> (2) shall reverse or remand the case for further proceedings if the substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
>>> (A) in violation of a constitutional or statutory provision;
>>>
>>> (B) in excess of the agency's statutory authority;
>>>
>>> (C) made through unlawful procedure;
>>>
>>> (D) affected by other error of law;
>>>
>>> (E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or
>>>
>>> (F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

*See* Tex. Gov't Code Ann. § 2001.174 (West 2016); *Heritage on the San Gabriel Homeowners Ass'n v. Tex. Comm'n on Envtl. Quality*, 393 S.W.3d 417, 423–24 (Tex. App.—Austin 2012, pet. denied); *Citizens Against Landfill Location v. Tex. Comm'n on Envtl. Quality*, 169 S.W.3d 258, 263 (Tex. App.—Austin 2005, pet. denied).

Under this standard, we review the Commission's legal conclusions for errors of law and its factual findings for support by substantial evidence. *Heritage*, 393 S.W.3d at 424. The substantial-evidence standard "is a limited standard of review that gives significant deference to the agency in its field of expertise." *R.R.*

*Comm'n of Tex. v. Torch Operating Co.*, 912 S.W.2d 790, 792 (Tex. 1995). We may not substitute our judgment for the agency's. *Id.*; *Citizens*, 169 S.W.3d at 264. The issue before us is not whether the agency reached the correct conclusion but whether there is some reasonable basis in the record for the agency's action. *R.R. Comm'n*, 912 S.W.2d at 792; *Citizens*, 169 S.W.3d at 264. The standard requires "only more than a scintilla" of evidence, and the evidence "actually may preponderate against the decision of the agency and nonetheless amount to substantial evidence." *R.R. Comm'n*, 912 S.W.2d at 792–93; *see Citizens*, 169 S.W.3d at 264. We presume that the agency's findings, inferences, conclusions, and decisions are supported by substantial evidence, and the party challenging the decision bears the burden to prove otherwise. *See State v. Pub. Util. Comm'n of Tex.*, 883 S.W.2d 190, 204 (Tex. 1994); *Tex.-Fin, Inc. v. Ducharne*, 492 S.W.3d 430, 439 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *AEP Texas Commercial & Indus. Retail Ltd. P'ship v. Pub. Util. Comm'n of Tex.*, 436 S.W.3d 890, 904–05 (Tex. App.—Austin 2014, no pet.); *Heritage*, 393 S.W.3d at 424; *Citizens*, 169 S.W.3d at 264. Further, the agency's decision should be reversed only if the challenging party demonstrates that the absence of substantial evidence has prejudiced the party's substantial rights. *See* Tex. Gov't Code Ann. § 2001.174(2); *Citizens*, 169 S.W.3d at 264.

Whether the agency's order satisfies the substantial-evidence standard is a question of law. *Heritage*, 393 S.W.3d at 424. In other words, we do not defer to the district court's judgment that there was substantial evidence supporting the agency's order. *Id.* On appeal from the district court's judgment, our focus, as in the district court, is on the agency's decision. *Id.*

Additionally, this appeal involves issues of statutory construction. Construction of a statute is a question of law, which we review de novo. *See*

*Lippincott v. Whisenhunt*, 462 S.W.3d 507, 509 (Tex. 2015) (per curiam). If the statutory language is unambiguous, we interpret the statute according to its plain meaning. *See id.* With respect to traditional statutory-construction principles applicable to this case, generally a more specific statute controls over the more general. *See Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 901 (Tex. 2000). Further, as a general principle, we should avoid interpretation of a statute that would render any part meaningless. *See City of Dallas v. TCI West End, Inc.*, 463 S.W.3d 53, 57 (Tex. 2015).

### III. CHALLENGE TO ISSUANCE OF THE AMENDED PERMIT

As all parties agree, the City must obtain a permit from the Commission for the activities described in the City's application. Specifically, section 11.042 of the Water Code, which governs "Delivering Water Down Banks and Beds," requires authorization for the City to use the bed and banks of the North Fork to convey the surface-water-based effluent from Outfall No. 001 to the proposed diversion point:

> . . . a person who wishes to convey and subsequently divert water in a watercourse or stream must obtain the prior approval of the commission through a bed and banks authorization. The authorization shall allow to be diverted only the amount of water put into a watercourse or stream, less carriage losses and subject to any special conditions that may address the impact of the discharge, conveyance, and diversion on existing permits, certified filings, or certificates of adjudication, instream uses, and freshwater inflows to bays and estuaries. . . .

Tex. Water Code Ann. § 11.042(c). Because the effluent would be partially derived from surface water, in addition to privately owned groundwater, the City sought a bed and banks permit under section 11.042(c).[5] And, because the City

---

[5] Section 11.042 also requires a bed-and-banks permit to convey and divert return flows derived from privately owned groundwater. *See* Tex. Water Code Ann. § 11.042(b) (West Supp.

had an existing permit to reuse such effluent, it sought authorization to convey and divert the effluent via the bed and banks of the North Fork as an amendment to the existing permit.

## A. Janes's Contentions

Janes presents its challenge to issuance of the amended permit as invoking the portions of the substantial-evidence standard set forth under subsections (2)(A) and (D) of Government Code section 2001.174, asserting that Janes's substantial rights were prejudiced because the Order was affected by a violation of statutes and an error of law. *See* Tex. Gov't Code Ann. § 2001.174(2)(A), (D). The crux of Janes's argument is that under applicable statutes, the Commission may not permit the City to divert the discharged effluent without first protecting Janes's senior rights to that water. Janes cites several principles and statutes collectively to support its position.

Janes emphasizes that the discharged effluent is derived from both surface water and groundwater. It is undisputed that generally surface water in natural watercourses is State water, whereas groundwater is privately owned. *See Edwards Aquifer Auth. v. Day*, 369 S.W.3d 814, 822–23 (Tex. 2012).

Janes relies on Texas Water Code section 11.046(c), entitled "Return Surplus Water," which provides:

---

2016). Before the Commission, Janes challenged the request for an amended permit to the extent the discharged effluent also was derived from groundwater. However, on appeal, Janes does not challenge the City's right to divert the groundwater-sourced effluent and relies instead on the fact that the effluent is also derived from surface water. Evidence showed that because of declining levels in Lake Meredith, during the recent years before the Order, the City's predominant source of potable water had been groundwater and the discharges from Outfall No. 001 have been predominantly comprised of groundwater-based effluent. Regardless, because the discharged effluent has variously consisted also of effluent derived from surface water, the City sought a bed-and-banks permit under section 11.042(c)

9

(c) Except as specifically provided otherwise in the water right, water appropriated under a permit, certified filing, or certificate of adjudication may, prior to its release into a watercourse or stream, be beneficially used and reused by the holder of a permit, certified filing, or certificate of adjudication for the purposes and locations of use provided in the permit, certified filing, or certificate of adjudication. Once water has been diverted under a permit, certified filing, or certificate of adjudication and then returned to a watercourse or stream, however, it is considered surplus water and therefore subject to reservation for instream uses or beneficial inflows or to appropriation by others unless expressly provided otherwise in the permit, certified filing, or certificate of adjudication.

Tex. Water Code Ann. § 11.046(c) (West 2008). Janes asserts that this statute applies to the discharged effluent because (1) "water has been diverted under a permit" because the effluent is derived in part from surface water purchased from CRMWA pursuant to a permit, (2) the water has "then [been] returned to a watercourse or stream" through the City's discharge into the North Fork, and (3) there was no permit, certified filing, or certificate of adjudication expressly providing that the discharged flows are not considered surplus water.

Janes also relies on section 11.042(c) and maintains that the statute does not authorize a bed and banks permit when the party has already begun discharging water before obtaining the permit, as in the present case. Janes cites the portion of the statute stating that "a person who wishes to convey and subsequently divert water in a watercourse or stream must obtain the **prior approval** of the commission through a bed and banks authorization." *See id.* § 11.042(c) (emphasis added).

Janes also cites two other sections in the Water Code: Section 11.134, which provides, relative to a permit to appropriate State water, that the Commission "shall" grant the application if, among other requirements, the appropriation "does

10

not impair existing water rights . . . ." *Id.* § 11.134(b)(3)(B) (West 2008); and section 11.027, providing that with respect to State water, "As between appropriators, the first in time is the first in right." *Id.* § 11.027 (West 2008).

Based on the above-cited authority collectively, Janes's argument may be summarized as follows: (1) because the City has been discharging the effluent derived from surface water into the North Fork before obtaining a bed-and-banks permit, existing discharges have become surplus water, the City's requested diversion would constitute a new appropriation of water, and the discharges are subject to appropriation by others with rights in the North Fork (reading section 11.046(c) and 11.042(c) together); (2) thus, the Commission may not grant the City a bed-and-banks permit to divert both existing and future discharges without considering the impact on existing water rights holders (per section 11.134(b)(3)(B)); and (3) the discharges are "subject to reservation" for Janes's appropriation by virtue of its first-in-time permit issued in 1968 (per section 11.027). Hence, Janes's first stated issue is the following:

> When a person has already commenced discharging his effluent derived from surface water, is the [Commission] prohibited from granting the person a permit to divert such discharged amount downstream, without subordinating such diversion to senior water right holders who are downstream from the diversion?

Janes maintains that the Commission failed to consider, or properly apply, all of the above-cited statutes when granting the amended permit and whether Janes will remain able to divert its annual permitted 450 acre-feet of water if the City were granted the amended permit. Janes does not claim the amendment will necessarily adversely impact Janes's appropriation but that the Commission at least should have evaluated whether there will be such an adverse effect.

Alternatively, Janes argues that even if section 11.046(c) is inapplicable and the effluent is not considered surplus water when discharged into the North Fork, section 11.042(c) still does not authorize a bed-and-banks permit when the party has already begun discharging before obtaining the permit without the City determining whether senior rights holders will be adversely affected. Therefore, Janes maintains that even considering section 11.042(c) alone, the permit was improper and Janes's substantial rights were affected.

**B.      Appellees' Contentions**

Appellees disagree that the treated effluent can be considered surplus water under section 11.046(c) after being discharged into the North Fork. Appellees cite various reasons that the effluent does not satisfy section 11.046(c) or that the exception therein applies. Appellees also dispute that the City's request for a bed-and-banks permit, as an amendment to the existing permit, must yield to any senior rights of Janes. Appellees point to section 11.042(c) and the statute and rule governing amended permits as the controlling authority.

Specifically, appellees maintain that because the City's request complies with section 11.042(c)—it seeks to divert no more than the amount discharged (minus carriage losses)—the effluent is not a new appropriation of State water subject to appropriation by senior water rights holders in the North Fork. In this regard, appellees also dispute that a bed-and-banks permit is limited to new discharges of surface water. Appellees thus contend that the amended permit satisfies section 11.042(c).

Appellees agree that the amendment may not adversely affect Janes but argue that any adverse effect must be evaluated under the standard prescribed in Texas Water Code section 11.122, entitled "Amendments to Water Rights Required," which provides in pertinent part:

12

(a) All holders of permits . . . shall obtain from the commission authority to change the place of use, purpose of use, point of diversion, rate of diversion, acreage to be irrigated, or otherwise alter a water right. . . .

(b) Subject to meeting all other applicable requirements of this chapter for the approval of an application, an amendment, except an amendment to a water right that increases the amount of water authorized to be diverted or the authorized rate of diversion, shall be authorized if the requested change will not cause adverse impact on other water right holders or the environment on the stream of greater magnitude than under circumstances in which the permit . . . that is sought to be amended was fully exercised according to its terms and conditions as they existed before the requested amendment.

(c) The commission shall adopt rules to effectuate the provisions of this section.

Tex. Water Code Ann. § 11.122 (West 2008). The Texas Administrative Code includes such a "No injury" rule, essentially mirroring the pertinent provisions of section 11.122 and placing the burden on the applicant to prove that the amended permit will not adversely impact other water-rights holders under the standards in section 11.122. *See* 30 Tex. Admin. Code § 297.45(b), (d).

According to appellees, there will be no adverse effect on Janes "of greater magnitude than under circumstances in which [the City's original permit] was fully exercised according to its terms and conditions as they existed before the requested amendment": under the original permit, the City has the exclusive right to fully use 22,910 acre-feet per year of its effluent; thus, its conveyance and diversion via the North Fork of no more than the amount of effluent it is permitted to use has a "net effect" of "zero" on Janes. The City characterizes Janes's complaint as seeking to improperly lay claim to the City's own effluent which it has a right to transport via the North Fork for reuse.

## C.     The Commission's Order

In the Order, the Commission made numerous findings of fact and conclusions of law, including the following, which are pertinent to the issues on appeal and cumulatively rejected Janes's position and adopted appellees' position:

**Findings of Fact:**

52.   The Application does not request a new or additional appropriation of State water.

60.   No water rights have been granted based on the availability of the City's discharge of any of its developed water-based treated effluent from Outfall No. 001.

61.   The flows in the North Fork created by the City through discharges of its developed water-based treated effluent at Outfall No. 001 are not part of the normal flow of the North Fork.

62.   A water availability analysis using the Brazos [Water Availability Model] was not required for the Application because the Application is not a request for a new appropriation of State water.

64.   As a result of the technical review of the Application, the [Commission] staff determined that no water rights in the Brazos River Basin have been granted based on the City's discharge of its developed water-based treated effluent from Outfall No. 001.

71.   [The Commission] staff concluded that the amendments sought in the Application would not impair any water rights within the Brazos River Basin.

92.   The City did not request in the Application the authority to divert any flows that have historically been in the Brazos River Basin.

134.  Under draft Permit 3985A, the City's diversions of flows created by the discharge at Outfall No. 001 of its Canadian River Basin surface water-based treated effluent pursuant to the [discharge] Permit do not have a priority date and are not

14

subject to priority calls from existing water rights holders in the Brazos River Basin.

135. Draft permit 3985A does not authorize the City to divert any State water.

136. Draft Permit 3985A will not deprive appropriators of state water within the Brazos River Basin of the equivalent quantity or quality of water that was available with the full, legal exercise of existing water rights before the change requested in the Application.

137. The terms and conditions of draft Permit 3985A will not increase any appropriator's legal obligation to a senior water right holder.

138. The terms and conditions of draft Permit 3985A will not substantially affect the continuation of stream conditions as they would exist with the full, legal exercise of existing water rights at the time those water rights were granted.

**Conclusions of law:**

6. The City must obtain prior authority from the [Commission] to convey the flows created by the discharge of . . . its developed Canadian River surface water-based treated effluent from Outfall No. 001 to the diversion point identified in draft Permit 3985A using the bed and banks of the North Fork. [citing, inter alia, section 11.042(c)]

10. [I]t is unnecessary to determine whether the requirements of Water Code § 11.134(b), have been met in order to grant the Application . . .

11. Because the City has requested authorization to divert and reuse its developed water-based treated effluent that it discharges from Outfall No. 001, the Application does not request a new or increased appropriation. . . .

20. The City has demonstrated that the Application satisfies each applicable statutory and regulatory requirement.

21. The evidence admitted in this case supports granting the Application and issuing draft Permit 3985A.[6]

_____

[6] We have recited above the pertinent findings and conclusions challenged by Janes as

15

In summary, the import of the findings and conclusions is that (1) the discharged effluent to be diverted is not part of the normal flow of the North Fork, (2) the City did not request a new or increased appropriation of State water, (3) the effluent is not subject to appropriation by others with rights in the North Fork, (4) there was no requirement that the City prove the diversion would not impair existing water rights pursuant to section 11.134(b)(3)(B), (5) the amended permit will not cause adverse impact on other water-rights holders in the North Fork "of greater magnitude than under circumstances in which [the City's original permit] was fully exercised according to its terms and conditions as they existed before the requested amendment," and (6) the City met the requirements for obtaining the bed-and-banks permit as an amendment to its existing permit. Although the Commission did not expressly mention section 11.046(c), it essentially rejected Janes's "surplus water" argument via the other findings and conclusions. As discussed below, we agree with the conclusions of law, and the administrative findings, inferences, conclusions, and decisions are reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole.

## D.   Analysis

Initially, we note, as mentioned above, that appellees proffer reasons that section 11.046(c) alone would not apply to the City's discharges of effluent into the North Fork and render the effluent surplus water subject to appropriation by others. The parties spend time disputing whether the discharged effluent could ever be considered surplus water under section 11.046(c).[7] However, we need not

_____

well as others we glean pertinent to understanding the Commission's determinations regarding the issues raised on appeal.

[7] For instance, appellees cumulatively posit that (1) the discharged effluent does not satisfy the general definition of "surplus water" in the Water Code, (2) section 11.046(c) applies

decide whether the discharged effluent would ever become surplus water because the Order may be affirmed under the statute governing bed-and-banks permits and the statutory standard for evaluating a request for an amended permit.

Apparently, Janes recognizes, as asserted by appellees, that section 11.042(c) is the statute most directly governing the activities planned by the City, rather than section 11.046(c), which generally describes situations under which surface water returned to a waterway becomes surplus water subject to appropriation by others. *Compare* Tex. Water Code Ann. § 11.042(c) *with* § 11.046(c). As we construe section 11.042(c), the Commission's authority to grant a party the right to use a stream to convey surface water from a discharge point to a point downstream, where it will be diverted for re-use, would be meaningless if, under section 11.046(c), the water became surplus water available for appropriation by senior rights holder upon being discharged into the stream.

In fact, Janes's argument that the effluent is surplus water subject to appropriation by those with superior rights in the North Fork depends not only on section 11.046(c) but also on construing that provision together with section 11.042(c) in the manner proffered by Janes. As mentioned above, Janes argues that the discharged effluent became surplus water subject to appropriation by those with superior rights because the City failed to comply with section 11.042(c) and obtain a bed-and-banks permit **before** discharging. Hence, in its appellate brief, Janes acknowledges that section 11.042(c), if satisfied, would control over section 11.046(c), but Janes maintains that section 11.042(c) was not satisfied;

_____

only to water returned to the same watercourse from which it originally was diverted, and (3) water diverted under a permit and then returned to a watercourse becomes surplus water "unless otherwise expressly provided in the permit" and Permit No. 3985 expressly provided otherwise by authorizing the City exclusively to use all its Canadian River Basin sourced effluent. Janes attacks these points raised by appellees.

specifically, Janes asserts, "[O]nce [the City's] discharge of surface water commenced, the City could no longer get special treatment for its downstream diversion just because its amount diverted is less than its amount discharged." We disagree.

Nothing in section 11.042(c) precluded the City from obtaining a bed-and-banks permit although it already had been discharging the effluent. *See id.* § 11.042(c). The statute requires a party who wishes to convey and divert the same amount of water to obtain "prior approval" from the Commission. *See id.* But the statute does not require "prior approval" before making the discharges that might ultimately be diverted. *See id.* It is clearly the diversion that is the hallmark of a bed-and-banks permit because the discharge alone would not constitute a conveyance to a diversion point. We see no difference in effect on the ultimate transportation via the bed and banks between obtaining the permit after the discharge but before the diversion or obtaining the permit before both the discharge and the diversion, as long as no more water is diverted than discharged. Consequently, we disagree that the fact the City had discharged effluent before seeking permission to divert precluded the Commission from allowing the conveyance and diversion via a bed-and-banks permit.

Therefore, because the diversion is permitted under a bed-and-banks permit, we agree with the import of the Commission's findings and conclusions that the discharged effluent was not surplus water subject to appropriation by other water rights holders in the North Fork and that the City's diversion would not constitute a new appropriation of water. Accordingly, the Commission did not improperly ignore or misapply sections 11.046(c) and 11.042(c). In turn, the Commission was not required to evaluate whether senior rights holders, including Janes, would be able to satisfy their permitted amounts from the discharged effluent if there were

insufficient water in the North Fork to otherwise satisfy their permits. Consequently, the Commission did not improperly ignore or misapply sections 11.134(b)(3)(B) and 11.027.[8]

We turn to appellees' contention that we must apply the standard for evaluating an application for an amended permit: it "shall" be granted if it will not cause adverse impact on Janes "of greater magnitude than under circumstances in which [the City's original permit] was fully exercised according to its terms and conditions as they existed before the requested amendment." *See id.* § 11.122(b); *see also* 30 Tex. Admin. Code § 297.45(b).

In this regard, we first address Janes's argument that section 11.122(b) is inapplicable because of the exception therein. The standard applies "except [to] an amendment to a water right that increases the amount of water authorized to be diverted or the authorized rate of diversion." *See* Tex. Water Code Ann. § 11.122(b); *see also* 30 Tex. Admin. Code § 297.45(b) (prescribing standard of section 11.122(b) as applicable except for an amendment "for the increase in the appropriative amount or diversion rate."). Janes asserts the bed-and-banks permit, because it involves a request to divert the discharged effluent, is plainly an amendment that "increases the amount of water authorized to be diverted." We disagree.

Although the bed-and-banks permit would authorize the City to divert water, it would not authorize any increase over an existing diversion. The original permit did not involve any diversion from the North Fork. Rather, the original permit

---

[8] We note that although the Commission concluded that it was unnecessary to determine whether the requirements of section 11.134(b) were satisfied, it also concluded the City proved it had met the requirements of that statute. Because the City was not required to prove section 11.134(b) was met, we need not address the Commission's additional conclusions that the requirements were met and we have omitted a recitation of the conclusions on that issue.

authorized the City to use 22,910 acre-feet per year of its effluent derived from surface water purchased from CRMWA. The amended permit would authorize the City to use the North Fork to transport a certain amount of that effluent to a point downstream where the effluent would be diverted for re-use. Contrary to Janes's suggestion, the exception under section 11.122(b) does not apply to any request to divert water but to an "increase[]" to the amount diverted. *See* Tex. Water Code Ann. § 11.122(b). The term "increase[]"connotes there has already been a diversion permitted.

Consequently, the Commission was required to evaluate conditions as though all waters-rights holders along the North Fork, including the City, would use their rights to the fullest extent allowed under their permits. *See id.* Under its original permit, the City was authorized to reuse a maximum of 22,910 acre-feet per year of its effluent. The City was not required to discharge any of that effluent into the North Fork. Nothing in the original permit removed the City's exclusive right to use the effluent in the event any were discharged. The source of all the water for the requested diversion is that 22,910 acre-feet of effluent. Further, the original permit was expressly issued subject to all superior rights in the Canadian River Basin and not subject to such rights in the Brazos River Basin. Finally, under the amended permit, the City may divert only the amount of effluent that it discharges. The Commission requires an accounting plan to ensure compliance. Janes does not challenge additional findings of the Commission that the accounting plan is reasonable and reliable and will ensure compliance.

Thus, the effect on other waters rights holders in the North Fork, including Janes, if the City discharges 10,081 acre-feet of effluent into the North Fork and then diverts it downstream is the same as the effect on such water rights holders if the City had fully exercised its rights under the original permit. As appellees

20

assert, the effect of the amended permit is no different than if the City used a pipeline instead of the North Fork to transport the effluent from the treatment facility to the diversion point; the effect on downstream water rights holders is as though the City did not discharge any water into the North Fork. Accordingly, there is no adverse effect on Janes under the standard prescribed in section 11.122(b).

In summary, we conclude James has not shown that the Commission improperly granted the City's request for the amended permit or that the Commission violated any statute or committed any legal error in granting this request. Accordingly, we overrule Janes's first issue.

## IV. CHALLENGE TO CALCULATION OF CARRIAGE LOSSES

In its second issue, Janes asserts that its substantial rights have been prejudiced because there is no evidence to support the Commission's findings, conclusions, and decision with respect to the calculation of carriage losses.

As stated above, the Commission may permit, via a bed-and-banks permit, the diversion of only the amount of water put into a watercourse or stream, "less carriage losses." *See id.* § 11.042(c). Carriage losses refers to the amount of flow lost during conveyance between the discharge and diversion points and includes the water lost to evaporation from the surface, evapotranspiration by plants along the stream, and seepage through the channel bed. Carriage losses are typically quantified as a percentage of the total volume of water lost between the beginning of transportation and the diversion point. The Commission requires that an application for a bed-and-banks permit under section 11.042(c) include an estimate of carriage losses. *See* 30 Tex. Admin. Code § 295.113(b)(7).

21

## A.     The City's Evidence and the Commission's Findings

To prove carriage losses, the City submitted with its application a memorandum prepared by Chester Carthel, who was the City's then-Water Planning Manager ("the Carthel memo").  At the administrative hearing, the City relied on the Carthel memo, plus the testimony of Dunn, Alexander, and Aubrey Spear (the City's director of water resources).

In the memo, Carthel calculated the carriage losses, and the witnesses essentially reiterated the method relied on in the memo.  The Carthel memo was originally prepared in 2004, to support an application for an amendment to an unrelated permit but included data pertinent to the application at issue. Carthel summarized methodologies used to estimate losses in the Jim Bertram Lake System in Lubbock County, which included a string of lakes upstream and the portion of the North Fork between Outfall No. 001 and the City's proposed diversion point—the stream segment at issue in the present case.

According to this evidence, carriage losses are categorized into two components: (1) Net Annual Evaporation, which is the total lost to evaporation and evapotranspiration; and (2) stream losses, which represent all other losses such as seepage and channel losses.  The Net Annual Evaporation information was obtained from the Texas Water Development Board data for Lubbock County and covered a period of approximately fifty years preceding the City's 2004 application.  The Net Annual Evaporation factor was applied to the surface area of the lakes and streams, including the segment at issue in the present case.  Then, the stream losses were estimated by applying a reduction factor to the Net Annual Evaporation, according to a process used by an engineering firm for another project.  That firm estimated stream losses at 50% of the Net Annual Evaporation. Carthel applied the 50% figure to most lakes in the system.  Carthel doubled that

22

50% figure to 100% of the Net Annual Evaporation for streams in the system, which the City believed was conservative as an overestimation of the stream losses. Carthel stated that to support this hypothesis, the City (1) interviewed landowners "along the canyon" who reported that "springs still exist," and (2) surveyed the segment at issue on May 19, 2003, before discharge began, and observed a steady stream flow of approximately 10 million gallons per day at Outfall No. 001. Applying his calculations to the surface area of the segment, Carthel assigned a figure of .47% to the 10,081 acre-feet of water to be conveyed.

The City's expert, Dunn, has personally calculated carriage losses, including in the Brazos River Basin. Dunn opined that (1) the City's method in the present case was reasonable and accepted in the Texas water-resources industry, (2) the supporting data was reliable and commonly used in the industry, (3) .47% is a reliable reflection and "a good, strong estimate," of the carriage losses that will actually occur during the transport from Outfall No. 001 to the diversion point, and (4) carriage losses will be small due to the short distance between such points, which provides little opportunity for flows to be lost. Similarly, the Commission employee, Alexander, testified that the Commission staff reviewed the City's information and found the calculations to be reasonable considering the short distance and recommended the City's figure be approved. Spear also testified that a minimal amount is lost because of the length of the segment.

In the Order, the Commission made several findings of fact relative to the determination of carriage losses:

65. The City estimated the carriage losses to be 0.47 percent of the total amount it discharges into the North Fork at Outfall No. 001 and conveys to the Diversion Point.

66. The methodology used by the City to determine the carriage losses associated with the requests made in the Application

23

provides a reasonable assessment of the carriage losses that can be expected to occur between Outfall No. 001 and the Diversion Point.

67. The underlying data used by the City to determine the carriage losses associated with the requests made in the Application is data that is commonly relied upon in the Texas water resources industry for making these types of assessments.

68. The 2.7 river-mile distance between Outfall No. 001 and the Diversion Point provides little opportunity for the loss of significant volumes of flows during the conveyance of the City's developed water-based treated effluent using the bed and banks of the North Fork.

69. The 0.47 percent carriage loss factor used by the City in the Application is a reliable reflection of the carriage losses that will occur during the City's transport of its developed water-based treated effluent from Outfall No. 001 to the Diversion Point.

70. As a result of the technical review of the Application, [the Commission] staff determined that the City's estimate of carriage losses between Outfall No. 001 and the Diversion Point was reasonable and the method used to determine the losses was acceptable.

To summarize the findings, the Commission adopted the .47% carriage loss figure estimated by the City, determining its methodology and conclusion were reasonable and reliable.

## B. Janes's Contentions and Analysis

Janes contends that its substantial rights have been prejudiced because there is legally insufficient evidence to support the Commission's determination of carriage losses. Though Janes does not expressly assert in its appellate brief that this determination is not supported by substantial evidence, legally insufficient evidence is not substantial evidence. *See R.R. Comm'n*, 912 S.W.2d at 792–93. Therefore, Janes is seeking relief under section 2001.174(2)(E) and effectively

24

asserting that the Commission's determination of carriage losses is not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole. *See* Tex. Gov't Code Ann. § 2001.174(2)(E); *R.R. Comm'n*, 912 S.W.2d at 792–93. In this context, Janes asserts that the City failed to submit any reliable evidence of the total amount of carriage losses. According to Janes, the only support in the administrative record for the City's .47% figure is the Carthel memo, which reveals that this figure is "a product of guesswork."

Janes focuses on Carthel's calculation of the second component—stream losses—and particularly the seepage factor. Janes complains that Carthel estimated, rather than measured, the stream losses and his estimation of the 100% multiplier (applied to the Net Annual Evaporation) to determine stream losses is unreliable. For several reasons, Janes posits that the City failed to show why the 50% multiplier for lakes upstream was merely doubled for the segment at issue instead of multiplied by, for example, four, eight, or twenty, and there is an analytical gap between the 50% and 100%. Janes argues, in turn, that because the 100% multiplier has no factual basis, the .47% figure has no factual basis, and Carthel's conclusion is legally no evidence. Janes asserts its substantial rights were affected because understatement of carriage losses results in less water available to downstream users than if the discharge and diversion did not occur.

Janes asserts that the Commission's carriage-loss calculation is not supported by any evidence because there is no reasonable or reliable basis to make a seepage determination for the 2.7 mile stream segment. Janes's arguments in this regard may be summarized as follows: (1) the City did not account for the dry, sandy composition of the streambed, leading to larger carriage losses, and no one walked the 2.7 mile stream segment to accurately assess the conditions; (2) Carthel's discussions with landowners and field observations were insufficient; (3)

25

no one actually measured the reduction in flow between the discharge and diversion points, as a method of calculating stream losses; and (4) the City failed to consider a larger carriage loss figure under another method.[9] We conclude that substantial evidence supports the reasonableness and reliability of Carthel's calculation of stream losses and negates Janes's points challenging Carthel's method and underlying data.[10]

*Composition of the soil and conditions of the segment*

First, Janes complains that Carthel did not take into account that the riverbed of the segment is composed of dry, sandy soil, which could allow seepage of a

---

[9] Janes cites the *Robinson* and *Havner* cases for a few general propositions regarding expert testimony and scientific testimony. *See E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 556–57 (Tex. 1995); *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997). But, Janes does not set forth in its appellant's brief the *Robinson* factors or the *Gammill* analysis, nor does Janes provide analysis and citation to legal authorities as to the application of the *Robinson* factors or the *Gammill* analysis to the carriage-loss issues in this case. *See Transcontinental Ins. Co. v. Crump*, 330 S.W.3d 211, 215–17 (Tex. 2010) (discussing legal standard under the *Robinson* analysis and the *Gammill* analysis); *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726–28 (Tex. 1998) (outlining the *Gammill* analysis); *Robinson*, 923 S.W.2d 549, 557 (listing six non-exclusive factors). Because Janes has not sufficiently briefed the issue of whether any evidence is unreliable under the *Robinson* factors or the *Gammill* analysis, we do not address these issues. We do address Janes's assertions that certain evidence is unreliable or unreasonable as part of our analysis as to whether the Commission's determination of carriage losses is not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole. *See* Tex. Gov't Code Ann. § 2001.174(2)(E).

[10] Appellees contend Janes waived its challenge to the reliability of Carthel's conclusion by not only failing to object to admission of the Carthel memo during the administrative proceeding but also by offering the memo into evidence. As discussed in the prior footnote, we are considering Janes's assertions that certain evidence is unreliable only as part of our analysis as to whether the Commission's determination of carriage losses is not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole. Because we conclude that the Commission's findings as to carriage losses are reasonably supported by substantial evidence considering the reliable and probative evidence, we need not decide whether Janes was required to object in order to challenge the reliability of Carthel's conclusion.

"tremendous" volume of water. As Janes asserts, Dunn agreed that a dry, sandy bed probably would have greater seepage rates temporarily until the pores are filled, seepage is ultimately related to porosity and permeability, and he was unaware of any testing regarding those characteristics of the soil in the segment at issue. Additionally, Spear acknowledged the City does not discharge continuously from Outfall No. 001, the amount varies widely from zero to closer to the maximum volume authorized by the discharge permit, and the North Fork is dry 90% of the time. Moreover, in a 1990 document regarding intended wastewater treatment and conveyance, the City stated, "Much of the water discharged would be lost to evaporation before it reached an area where it could be used to meet existing and future water demands." According to Janes, this statement was made before the City requested its amended permit and thus before it had an incentive to reduce its calculation of carriage losses. Finally, Janes's engineering expert, Tom Koch, who disagreed with the .47% figure testified it was inconsistent with his personal observations on August 11, 2011 that streamflow in the North Fork "disappeared" as it moved downstream.

However, some evidence negated Janes's assertion that the bed is dry and thus would allow for significant seepage. Although no witness walked the length of the segment, Dunn observed the discharge and diversion points and opined that there is a "pretty strong inference" based on observed flows at both points "that it's flowing in between." Dunn also testified that at the time of the hearing (October 2011), the City was discharging every day and the diversion point would never be dry. Spear added that although the discharges varied widely, the City was discharging an average of two to three million gallons per day at Outfall No. 001. Spear explained that during the nine months before the hearing, the City had discharged every day and based on his several, periodic observations of the

27

discharge and diversion points, the segment remained saturated, with the same amount of discharged water passing the diversion point. Spear qualified that his statement about the North Fork being dry 90% of the time was made during his pre-filed testimony, it generally referred to the entire length (250 miles), which, as an intermittent segment of the Brazos, does not have flow, but some segments (including the one at issue) have become saturated because the City is discharging water. Additionally, the City's document (referenced above), acknowledging the possibility that much of the water would be lost before reaching a diversion point, was prepared years before the Commission hearing at which the City's witnesses explained the current conditions of the segment.

*The City's surveys and observations*

Next, Janes challenges Carthel's reliance on surveys and observations, asserting they highlight the lack of an evidentiary basis for his opinion. Janes attacks Carthel's reference to a one-day survey observing a steady stream flow at the discharge point. Janes maintains that one day's survey is insufficient to determine the daily, monthly, or annual stream flow, but even if it was, there was no measurement of flow at the diversion point. Janes's expert, Koch, opined that it is nonsensical to assume that the same percentage of flow is lost every day regardless of whether it has rained and regardless of the season. Although that survey was only one day and Carthrel described only the flow at the discharge point, other evidence, as cited above, indicated that the flows were similar between the discharge and diversion points at various times closer to the time of the hearing. And, Dunn explained that because conditions vary from time to time, an expert tries to achieve a long-term average stream loss, thus disputing Janes's suggestion that an average rather than daily calculation is insufficient.

Janes also attacks Carthel's statement that "discussions with landowners along the canyon indicate that springs still exist" because (1) Carthel did not set forth the location, flow, or regularity of any springs or whether they feed into the stream segment at issue, and (2) even if a spring did feed into the segment, such fact would possibly indicate a higher seepage amount because Dunn acknowledged that intervening sources adding water to a stream factor into carriage losses. We acknowledge that Carthel's vague reference to springs did not establish such springs fed into the segment at issue. Nonetheless, even omitting his reference to springs, his opinion was sufficiently supported by the City's observation of flows at the discharge point, as referenced in the memo, together with the other testimony, as discussed above, regarding flows between the discharge and diversion points closer to the time of the hearing.

*Alternative methods*

Additionally, Janes emphasizes that the City failed to utilize the paired-discharged method for calculating stream losses, which would involve measuring flows at the discharge and diversion points and discovering whether there are intervening water sources, such as springs. Janes points out that Dunn suggested time and money were obstacles to utilizing that method but also acknowledged he has never taken more than two weeks to perform the task using that method and has been paid more than $1 million for his total work for the City while the method would cost at most $50,000. However, Dunn also testified that while the paired-discharge method is an accurate method, it is not the only accurate method.

Janes also points out that Dunn acknowledged that the .47% figure is smaller than a figure of 1.6%, which would be based on the Water Availability Model for the Brazos River Basin, which Dunn helped develop and has used to calculate carriage losses in the basin. He explained that the model did not calculate carriage

losses for the segment at issue, but he took information for a segment between two points, which bracketed the segment at issue, and interpolated the value. But, Dunn also opined that the 1.6% figure is still a small carriage loss factor because of the short length of the stream and compared to the .47%, it is "a large difference of two relatively small numbers" and both are very small numbers "volumetrically." According to Janes, the City improperly considered the difference as insignificant simply because both numbers are small and there is no legal basis for the proposition that the Commission may accept a carriage-loss figure because "the applicant does not think it is worth his time to actually calculate it." However, Dunn also testified that the difference between .47% and 1.6% is within the State and industry-standard requirements that carriage losses be measured with an accuracy of plus or minus 5%. And, Dunn implicitly negated that a calculation based on the Water Availability Model was definitive. He testified that the factors in the model are based upon overall carriage loss over 183 miles of river in the basin and considering the conditions anticipated over a 2.7 mile segment, instead of over a much longer and more diverse segment, the City's figure of .47% was reasonable.

Finally, relative to all of Janes's complaints, Dunn testified that methods for determining carriage losses vary, depending on the availability of data to make the determination, and there is no single method. He explained that carriage losses, particularly evapotranspiration and stream losses, are difficult to measure, it is not an exact science, and because evaporation is easier to measure, an expert may take that figure and then account for the other components within the bounds of the evaporation figure. Dunn opined that the other methods mentioned by Janes for determining stream losses are alternatives but "I wouldn't say it would be any more reliable or any less reliable" than Carthel's method.

30

In summary, even if the alleged deficiencies raised by Janes would preponderate against the City's carriage-loss figure, we are bound under the substantial-evidence standard to uphold the Commission's findings if supported by more than a scintilla of evidence. *See R.R. Comm'n*, 912 S.W.2d at 792–93; *Citizens*, 169 S.W.3d at 264. We hold that Carthel's calculation of the 100% multiplier to determine stream losses is supported by more than a scintilla of evidence. The Commission adopted the .47% carriage loss figure estimated by the City, finding that the City's methodology and conclusion are reasonable and reliable. We conclude that these findings are supported by more than a scintilla of evidence and that Janes has not met its burden to rebut the presumption that substantial evidence supports these findings. *See Pub. Util. Comm'n*, 883 S.W.2d at 204; *Tex.-Fin, Inc.*, 492 S.W.3d at 439; *AEP Texas Commercial & Indus.*, 436 S.W.3d at 904–05; *Heritage*; 393 S.W.3d at 424; *Citizens*, 169 S.W.3d at 264. Under the applicable standard of review, we conclude that the Commission's findings regarding carriage losses are supported by substantial evidence considering the reliable and probative evidence in the record as a whole. *See Pub. Util. Comm'n*, 883 S.W.2d at 204; *Heritage*; 393 S.W.3d at 424; *Citizens*, 169 S.W.3d at 264. Accordingly, we overrule Janes's second issue.

## V. CONCLUSION

Janes has not shown any grounds under Texas Government Code section 2001.174 for reversing the Commission's order or remanding the case for further proceedings. Therefore, the trial court did not err by upholding the Commission's order. We affirm the trial court's judgment.

/s/    John Donovan
Justice

Panel consists of Chief Justice Frost and Justices Christopher and Donovan.